John Michael GARDNER, Appellant,

v.

The STATE of Texas, Appellee.

No. 3–86–224–CR.

Court of Appeals of Texas,
Austin.

Feb. 17, 1988.

Rehearing Denied March 16, 1988.

Daniel H. Wannamaker, Kazen & Ray, Austin, for appellant.

Ronald Earle, Dist. Atty, Honorable James M. Connally, Asst. Dist. Atty., Austin, for appellee.

Before SHANNON, C.J., and GAMMAGE and ABOUSSIE, JJ.

PER CURIAM.

A jury found appellant guilty of murder. Tex.Pen.Code Ann. § 19.02 (1974). The district court assessed punishment at imprisonment for life.

At 1:20 a.m., October 17, 1985, Bonnie Moore heard a scream and a gunshot from the undeveloped field behind her residence in southwest Austin. Moore awakened her husband, Austin police officer Gary Moore. As both listened, Bonnie Moore heard the sound of a car engine coming from the field. Gary Moore and a police officer who responded to the Moore's call conducted a preliminary search of the area behind the Moore residence, but discovered nothing.

At approximately 3:00 a.m. on October 17, Stephen Muse, a driver for Yellow Cab, was dispatched to a service station in the Oak Hill section of southwest Austin. When he arrived at the station, which was closed, Muse saw a man he identified as appellant sitting between the gas pumps. Appellant responded affirmatively when asked if he had called for a cab. As appellant entered the cab, Muse noticed that his shoes were muddy.

When Muse inquired into appellant's destination, appellant asked if Muse knew the location of the North Forty. Muse, recognizing the North Forty as a nightclub in north Austin, began to drive in that direction. However, appellant had Muse stop the cab a short distance from the North Forty, and the last time Muse saw appellant that night, appellant was walking into a vacant lot.

At approximately 9:30 a.m. that same day, an American cab was found abandoned in a brushy area several yards off Travis Country Boulevard in southwest Austin. The cab's meter was still running, the left rear door was ajar, and the vehicle was covered with black mud of a type that did not match the caliche soil of that location. The cab, which had been driven by Anna Maria Lima, was taken to the Austin Police Department for further processing. During the course of this processing, a

fingerprint later identified as that of appellant was found on the left rear interior door handle of the cab.

That afternoon, Gary Moore, who had learned of the discovery of the abandoned cab and of the disappearance of Anna Lima, conducted another search of the field behind his house. Because of recent heavy rain, the field was extremely muddy. After searching the field for several minutes, Moore discovered the body of Anna Lima lying near a dirt road that was at the time covered with mud. There were vehicle tracks in the mud that appeared to be fresh.

The autopsy of the body of Anna Lima disclosed that she had been killed by a single gunshot to the chest. A .45 caliber bullet was removed from the body and given to Austin Police Department firearms specialist Calvin Story.

As a result of his examination of the fatal bullet, Story determined that it had been fired from a Heckler & Koch model P9S semiautomatic pistol. These pistols are manufactured in West Germany and have a unique barrel design that does not utilize conventional rifling. Such pistols are expensive and relatively rare; this was Story's first encounter with such a bullet in his twelve-year career.

Through the testimony of several witnesses, the State established that a Heckler & Koch model P9S was stolen from Austin resident Anthony Deering in July 1985. The thief, Brett Weiss, sold the weapon to appellant two months later. On November 1, 1985, two weeks after Anna Lima's murder, appellant sold the pistol to Paul Martins. At the time of the sale, appellant told Martins not to sell the pistol without first informing appellant. During the next several weeks, appellant called Martins several times to inquire if he still had the pistol.

The Heckler & Koch model P9S stolen from Deering and traced to appellant was recovered by the police when Martins sold it to an Austin gun shop. The pistol was introduced in evidence as State's Exhibit 54. Due to the condition of the fatal bullet, Story was unable to determine whether it had been fired from this particular pistol. However, Deering testified that the fatal bullet appeared to be of the type with which the pistol was loaded at the time it was stolen from him.

Jason Weston was an acquaintance of appellant. Shortly before sunrise on October 17, 1985, appellant appeared at Weston's apartment. Appellant was visibly upset and nervous, pacing the floor and making statements such as "I did it this time" and "I'm in trouble." Appellant was carrying his Heckler & Koch P9S pistol, with which Weston was familiar, and cleaned the weapon while in Weston's apartment. Appellant's shoes left mud on Weston's carpet.

The following day, Weston accompanied appellant to an undeveloped area in southwest Austin where the two men took turns firing the Heckler & Koch pistol. While driving to this location, appellant asked Weston if he "had heard about the cab driver getting shot over there." One week later, Weston took a police officer to the area where he and appellant had fired the pistol. Several shell casings were recovered, and ballistics tests confirmed that they had been fired in State's Exhibit 54.

During their conversation on October 18, appellant told Weston that if Weston ever "doubled-crossed" him, "he would blow me and my wife away and blow her away first." At the time appellant made this statement, he was holding the Heckler & Koch pistol and pointing it in Weston's direction. Appellant also told Weston "that the gun had blown somebody away before, and it would do it again."

Appellant was arrested for driving while intoxicated on October 19, 1985. One of his cellmates following this arrest was Allen Larson. Appellant asked Larson if he had heard about the murder of the cab driver, whom he referred to as a "bitch," remarking that "she deserved what she got" and "she was worthless." During the course of an argument with another prison-

er, appellant threatened to kill the prisoner, saying "he did it before."

■ In his first point of error, appellant contends the evidence is not sufficient to support the jury's verdict. In determining the sufficiency of the evidence to support a criminal conviction, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Carlsen v. State,* 654 S.W.2d 444, 448 (Tex.Cr.App.1983) (opinion on rehearing). In a circumstantial evidence case, if the evidence reasonably supports an inference other than appellant's guilt, a finding of guilt beyond a reasonable doubt is not a rational finding. *Id.*

■ The relevant evidence has already been summarized at length in this opinion. This Court finds the evidence more than sufficient to reasonably support the jury's verdict and to exclude all reasonable hypotheses other than appellant's guilt. The first point of error is overruled.

■ In his second point of error, appellant contends he was denied due course and due process of law because of prosecutorial misconduct. Specifically, appellant complains of the alleged suppression of a tape recording made by Austin police Sergeant Howard Hall of a telephone conversation Hall had with a potential witness, Jeffery Foster. Foster told Hall in this conversation that he might have seen Lima's cab drive past his home in southwest Austin between the hours of 1:30 and 2:30 a.m. on the night of the murder.

The suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material either to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). However, the record before this Court does not support the conclusion that the tape recording was suppressed. The existence of the recording was noted in Hall's offense report, which also contained a summary of the conversation. It is undisputed that Hall's offense report was in the prosecutor's file and that this file was made available to defense counsel prior to trial. At appellant's request, a recess of several days was granted by the district court during which time the recording was located and made available to defense counsel, and defense counsel had an opportunity to interview Foster. When trial resumed, the tape recording was admitted in evidence and played for the jury, and counsel for appellant expressly declined a further continuance in order to secure Foster's presence at trial. Clearly, appellant was given a reasonable opportunity to derive whatever benefit he could from the tape, and reversible error is not presented. *Coe v. State,* 683 S.W.2d 431, 437–438 (Tex.Cr.App.1984); *Holloway v. State,* 525 S.W.2d 165, 169 (Tex.Cr.App.1975); *Means v. State,* 429 S.W.2d 490, 496 (Tex.Cr.App.1968).

In his final points of error, appellant contends he was denied the opportunity to effectively confront the witnesses against him because evidence which could have been used for impeachment was destroyed. Both points of error concern the destruction of composite drawings prepared by a police artist. The first drawing was based on Stephen Muse's description of the fare he picked up at the service station in Oak Hill on the night of the murder. The second drawing was of a man who was seen by the doorman at the North Forty nightclub entering Anna Lima's cab at 12:30 a.m. on the night of the murder.

Both drawings were made early in the investigation before appellant was identified. Austin police Sergeant Russell Schmidt, who caused both drawings to be prepared, testified that he destroyed the drawings after appellant was arrested and charged with the offense.

In determining whether the loss or destruction of evidence has resulted in a violation of due process, the courts have de-

veloped a balancing test involving three factors: the likelihood that the lost evidence was exculpatory; the likelihood that the defendant was significantly prejudiced at trial by the absence of that evidence; and the level of government culpability. 2 LaFave & Israel, Criminal Procedure § 19.05(h) (1984). In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed. 2d 413 (1984), the Supreme Court stated:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet the standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

467 U.S. at 488, 489, 104 S.Ct. at 2534 (footnote and citation omitted).

■ The record reflects that Muse's description of the man who rode in his cab on the night of the murder, given one month before appellant was identified, was an accurate description of appellant. Thus, it may be inferred that the composite drawing based on that description bore at least a passing resemblance to appellant. Moreover, the record further reflects that Muse identified appellant in a photographic array and a corporeal lineup as well as at trial. Under the circumstances, it is unlikely that the drawing would have played a significant role in appellant's defense. Further, there is nothing in the record to indicate that the destruction of the drawing was a conscious effort to suppress exculpatory evidence.

■ The destruction of the second composite drawing was of even less significance to appellant. Anna Lima's trip log, which appears in the record, indicates that she picked up her last fare at the North Forty nightclub at 12:36 a.m. This fare was taken to a location on South Lamar where he exited the cab at 12:55. There is nothing in the record to suggest that this passenger was appellant, or in any way involved with or connected to Lima's murder. Further, Schmidt testified that the drawing bore no resemblance to appellant. Finally, this Court fails to see how the destruction of this drawing hindered appellant's ability to confront the witnesses against him, since the nightclub employee on whose description the drawing was based was not called as a witness.

There is no basis in the record for concluding that appellant was substantially prejudiced by the absence of the two composite drawings. Appellant's third and fourth points of error are overruled.

The judgment of conviction is affirmed.