**Jack Warren DAVIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 3–90–118–CR.**

Court of Appeals of Texas,
Austin.

May 13, 1992.

Discretionary Review Refused
Sept. 30, 1992.

428

John J. Curtis, New Braunfels, for appellant.

Bill M. Reimer, Dist. Atty., Comal County and Robert H. Fisher, Asst. Dist. Atty., New Braunfels, for appellee.

Before JONES, KIDD and B.A. SMITH, JJ.

JONES, Justice.

A jury convicted Jack Warren Davis, appellant, of capital murder. Tex.Penal Code Ann. § 19.03(a), (b) (1989). After the jury was unable to answer the first special issue on punishment (deliberateness), the court sentenced him to life imprisonment pursuant to 1985 Tex.Gen.Laws, ch. 44, § 2, at 434 (Tex.Code Crim.Proc. art. 37.071, since amended). Davis appeals, bringing sixteen points of error. We will reverse the judgment of conviction and remand the cause for a new trial.

On November 17, 1989, at approximately 10:15 p.m., appellant, a maintenance worker at the New Braunfels Oaks Apartments, reported to Carolyn Toth, the manager of the apartment complex, that he had found the body of Kathie Balonis in her apartment. The police were called. At some point after their arrival, the on-scene investigators became suspicious of appellant when they observed blood on his clothing and a cut on his left hand. Detective Felix Roque, New Braunfels Police Department, questioned appellant at the department. After this interview, the police took him to his apartment, allowed him to change clothes, and then seized the clothes he had been wearing. They returned him to the police department and fingerprinted him. The district attorney's office then requested that he be booked for the offense of murder.

## SUFFICIENCY OF THE EVIDENCE

Appellant contends, in point of error one, that the evidence is legally insufficient to support his conviction. The evidence in the case consisted of various accounts of the evening's events, forensic evidence such as the analysis of blood found at the scene, and expert testimony on the type of crime and possible characteristics of the offender (e.g., that it was possible for a person who had not displayed violent tendencies to, in essence, "explode").

### Discovery of the Body/Description of the Crime Scene

The apartment building in which Kathie Balonis lived, one of several buildings in the complex, is a two-story structure with three sets of stairs: east and west at either end of the building, as well as a middle staircase. Kathie's apartment was the westernmost apartment on the second floor. Marci French, another resident in the complex, lived in the apartment east of, and adjacent to, Kathie Balonis. Appellant lived on the ground floor in the apartment second from the east end of the building. On the day of the murder, he was wearing jeans, a tan maintenance uniform shirt, and a blue insulated-type vest. Appellant was described as having a medium heavy build, with medium-length brown hair and sideburns.

Appellant testified that on the night of the murder, at about 10:00 p.m., he went onto the porch outside his apartment to smoke a cigarette. He heard a sound, like somebody saying, "Hey." He looked to-

ward the west end of the building, in the direction of Kathie Balonis's apartment, but saw nothing. A minute or two later, he saw a man coming hurriedly, but not running, down the stairs. Appellant followed the man to the parking lot and saw him get into a small car (a Chevrolet Vega, he thought) and drive away rapidly.

Appellant stated he returned to the building and went up the west stairs. He saw people in Marci French's apartment, and everything looked all right. He went to Kathie's apartment, knocked three times, got out his passkey, but tried the knob and found the door unlocked. He entered and announced "maintenance" several times, but got no response. He saw the bed in front of the doorway, saw Kathie's body on the floor, kneeled beside her, put his arms underneath her shoulders, shook her, and shouted her name. He got no response, put her back down, and went to the apartment of Carolyn Toth, the apartment-complex manager, for help.

Carolyn Toth testified that appellant knocked at her door at about 10:15 p.m., telling her, "The girl in 202, it's horrible, it's horrible, she might be dead, you've got to come, it's horrible." Appellant was wearing blue jeans, a tan maintenance uniform shirt, a baseball hat, and a blue vest. She noticed what appeared to be blood on his clothing. He later said it was pizza sauce.

Toth said that appellant told her he had been watching television with his stepson, went out on the porch, heard a noise like a "herd of elephants" coming down the west staircase, and saw a man with shoulder-length dark hair wearing a white shirt. Appellant had said he followed the man as the man ran to the parking lot and left in a Vega. Toth told her mother to call the police, and the two of them and appellant went outside, where they encountered Karen Balonis, Kathie's sister, who also lived in the complex.

Karen Balonis had been doing laundry on the night of the murder. She left her apartment to attend to the laundry sometime after 10:00 (after the news had started, but before the weather came on). She saw Carolyn Toth, Toth's mother, and appellant standing at the entrance to the laundry room looking up. Toth told her that Kathie had been stabbed.

Karen ran to Kathie's apartment. She looked around the living room, then headed for the bedroom. The bed was blocking the entrance to the bedroom, so she had to climb over it. She saw her sister on the floor with the top of her head under the bed. As she pulled Kathie out from under the bed she did not see a lot of blood on her. She did, however, notice blood on the pillow case. She found no pulse, but started CPR anyway. At that point Marci French, a neighbor, and French's guest Shelly Flynn entered the apartment.

French saw Karen Balonis as she ran up the stairway. French said Karen paused, looked in her window, and ran over to Kathie's apartment. French then heard Karen scream that Kathie had been stabbed. She and Flynn ran to Kathie's bedroom. The bed was in front of the bedroom door and appeared to be in disarray. French told Flynn to call the police, then returned to her apartment to call the police herself because Flynn, her visitor, did not know the address of the apartment complex. When French saw that police were already arriving, she returned to Kathie's apartment. She did not notice the apartment being in disarray, other than the bed being in the wrong place. She moved an ironing board and a chair so that EMS personnel could get through the apartment more easily, and she put a sheet over Kathie's body.

As Karen was performing CPR on Kathie she told Flynn to apply pressure to an abdominal wound so that the CPR would not force more blood out of the wound. Karen said that at no time did she get more than a spot of blood on her pants leg—no blood was on her hands, mouth, or any other part of her body.

Officer Scott Lange, New Braunfels Police Department, responded to the call reporting a stabbing. When he arrived, he heard a scream. As he entered Kathie's apartment and went back to the bedroom, he noticed the bed blocking the doorway

from the living room to the bedroom. He saw Karen Balonis and Shelly Flynn in the bedroom and saw the body of Kathie Balonis on the floor. He went back outside to use his radio to call for EMS because the radio would not work inside the apartment. At that point, Officer Keating arrived and went into the apartment.

Lange remained about half-way up the stairway by the apartment. Appellant, who Lange knew was the maintenance worker at the apartments, approached Lange and expressed concern about Balonis' condition. Lange said that in his opinion appellant was intoxicated, although not to the point of incoherence. Appellant told Lange that he had seen the person who did it, describing a white male with black hair. He said the man ran down the stairs, ran beside the pool, ran between two other buildings and into the parking lot where he left in a Vega. Other than the one time he talked to him, Lange did not see appellant come up the stairs or stand on the upstairs balcony.

Shortly after 10:00 p.m., Officer Keating, New Braunfels Police Department, responded to the call about a stabbing. He entered Kathie's apartment and went to the bedroom. He could see that the bed was partially blocking the doorway. Three people were in the room. He went in and began CPR. He then removed Karen because she was "emotionally out of control" and went back into the apartment. He moved the bed so EMS technicians could get in.

Karen Balonis said that after EMS personnel arrived, she was asked to leave the apartment. She went outside on the balcony. She said appellant came up the center stairs to the balcony, hugged her, and kept telling her he was sorry. She said, contrary to appellant's version of events, that she did not return his hug, did not touch him, and could not have gotten any of Kathie's blood or saliva on him from her hands even if any had been on her hands, which she denied. Carolyn Toth, on the other hand, testified that she saw appellant go up the west stairs by the victim's apartment, and that when appellant embraced Karen Balonis, Karen returned the embrace. This dispute as to the nature of the embrace is important in the following respect: Forensic evidence placed Kathie Balonis' blood and saliva on the back shoulder of appellant's vest, which was not consistent with his account of what happened when he discovered the body. Appellant's exculpatory explanation was that the blood and saliva must have been on Karen Balonis' hands and was transferred to his clothing during their embrace on the balcony.

Officer Kama, an investigator for the New Braunfels police department, asked appellant what he had seen, and appellant told him. The officer shined a light on appellant's legs and asked what "that" (the bloodstain) was. Appellant told him at the time that it was pizza sauce, stating at trial that he "didn't, at that time, care for what he was insinuating." Later that evening, appellant was arrested. During subsequent questioning, appellant never told Detective Roque, an investigator with the New Braunfels Police Department, that the stain was anything other than appellant's own blood.

The State presented forensic evidence linking appellant to the scene. Fred Zain, the State's expert witness who performed the blood and DNA testing, testified to the presence of Kathie's blood and saliva on the right rear shoulder of appellant's vest and to the presence of her blood on appellant's pants leg. Zain also testified that appellant's blood was found on Kathie's pillow, on the carpet next to her body, on carpet away from the body, and on the neck of her blouse and sweater. Appellant's blood was also found on the outside doorknob of his apartment.

### Appellant's Account of Earlier Events

Appellant testified that he finished work between 3:30 and 4:00 p.m. on the day of the murder. He picked up his check around 4:00, went to his apartment, and attempted to open a large package that had arrived earlier that day. While using a kitchen knife to do so, he cut his hand on the palm, then pressed his hand against his pants leg in the left front pocket area in

order to stop the bleeding. He then helped Raymond Powell, his stepson, move some equipment from one apartment to another. Appellant then went to Landa Station, a restaurant, where he worked in the office. He left Landa Station around 6:30 p.m. and went to the Kings & Queens Bar to play darts. He said he falsely told the police in his statement taken on the day of the murder, November 17, that he got home at 6:30 because he felt bad about being at a bar playing darts while his wife was in the hospital. After he left the bar, he returned to Landa Station for a few minutes, then went home.

Pamela Sue Foulds, a friend of appellant and his wife, testified that she was at the Kings and Queens Bar on November 17, between 6:30 and 9:15 p.m. She saw appellant there and played darts with him. She did not see a cut on his hands or notice him bleeding. The fact that Foulds did not notice a cut is important because re-opening a previous wound is appellant's explanation for the presence of his own blood at the murder scene.

Appellant said he arrived home about 9:15 p.m. Raymond Powell and his wife Hazel Marie were in appellant's apartment watching television. While appellant ate dinner, he talked to them until around 10:00 p.m. or a little later, when they left.

Hazel Marie Powell is appellant's daughter-in-law. She testified that about 5:30 or 6:00 p.m., her husband Raymond returned home from work. She fixed him something to eat, and they went back to the New Braunfels Oaks Apartments to turn on the heat in an apartment that was to be painted the next day. The door to appellant's apartment was unlocked, so they went in a little after 8:00 p.m., turned on the television, and started watching a movie. Appellant returned a little after 9:00. He talked to them while he ate. Hazel Marie said that before they left, the movie had ended and she saw a clock that showed it to be almost 10:30 p.m. Her time estimate is inconsistent with other witnesses' accounts of the time when the body was discovered.

Rick Barr, a resident of the New Braunfels Oaks Apartments, said that on November 17, sometime between 4:00 p.m. and 5:00 p.m., he noticed a man with long dark stringy hair walking across the lawn to the stairs to Kathie Balonis' apartment. He did not see the man leave. Although the description is similar to appellant's description of the man he saw leaving later that night, Barr did not see the man enter Kathie Balonis' apartment and the time that Barr saw the man is much earlier than the murder.

Jessica Ornelas, who lived in the apartment below Kathie Balonis', said that at around 4:30 p.m. on the day of the murder she heard what sounded to her like the noise of water running in the bathroom coming from Kathie's apartment. Although this might tend to support the idea that someone else had access to the apartment, the time is again significantly earlier than the murder.

### Neighbors' Accounts of the Events

Carolyn Toth, the apartment complex manager, testified that she arrived at the apartment complex about 7:30 p.m. Around 9:15 p.m., she saw appellant arrive. At 9:45, she left with her mother to pick up her father. She saw a burnt-orange car leaving the parking lot, but did not see appellant in the parking lot. Toth and her parents returned about 10:05 and did not see a dark-haired man or appellant, nor did they see any vehicle leaving the parking lot. Maintenance records were introduced through Toth that showed no calls to Kathie Balonis' apartment in the several days before the murder.

Officer Keating, a patrolman with the New Braunfels Police Department, was a resident of the apartment complex and worked as a courtesy patrol for it. At about 9:55 p.m. on the night of the murder, he was at the complex. He testified that he did not see a Vega in the parking lot at the time and did not see appellant chasing anyone.

Marci French described the walls between the apartments as being thin enough to hear people talking or laughing in the adjacent apartment. The doors of the apartments were close enough together so

that one could hear knocking at adjacent doors. When the stairway outside her apartment is used, it causes her apartment to vibrate. During the evening, she never heard a scream, anyone running down the stairs, a knock on the door of the adjacent apartment, or an announcement of "maintenance," all directly contrary to appellant's account of events.

On the day of the murder, French was entertaining guests. She and her guests had been out shopping and returned to her apartment sometime between 8:45 and 9:00 p.m. Around 9:30 she heard some kind of "rumbling" noise that she first thought was coming from the stairs, but then thought was coming from Kathie's apartment.

One of the guests, Kenneth Stainbrook, said he was sitting next to a large window. At about 9:30 p.m., he saw a white male of medium build, wearing a tan cap and an insulated blue vest, out on the balcony. Fifteen to twenty minutes later, he saw the same person walking to the east on the balcony. Stainbrook never heard a knock on Balonis' door or an announcement of "maintenance."

Shelly Flynn, another of French's guests, saw a man walking by French's apartment in a west to east direction at about 9:20. Because her view was partially blocked, all Flynn could really see was the arm of his shirt. She was unsure whether the sleeve was a white underwear-type shirt or a tan shirt. She saw a man walk by again about 10:05. A few minutes later, she saw a man she identified as appellant walk by. She could not identify appellant as the man she had seen between 9:00 and 10:00 p.m. She never heard a knock on Kathie Balonis' door or an announcement of "maintenance." She said she later heard appellant make a comment about how he got Kathie Balonis' blood on himself.

After Kenneth Stainbrook and his wife left, shortly after 10:00 p.m., French saw a man crossing from east to west on the balcony. He was wearing a light-colored shirt and a sleeveless vest, and had brown hair with scruffy sideburns. She was alarmed because of the hour and because that portion of the balcony was seldom used as a travelway due to a large number of hanging plants in front of one of the apartments. She opened her door, but the man had already disappeared. Kathie Balonis' apartment door was closed.

After French reentered her apartment, she heard someone go down the stairs. She and Flynn went outside and looked down from the balcony, but did not see anyone. Shortly thereafter, French heard someone coming up the steps. She looked out her door, but saw no one. Kathie Balonis' door was shut. As French was on her way out her door to see what was going on at Kathie Balonis' apartment, she saw appellant coming out of Kathie's apartment. She said he stopped at the top of the stairs and "just pondered for a moment," then walked down the stairs. She said appellant was dressed the same way as the man she had seen earlier: a puffy blue vest, light-colored shirt, dark pants, and a cap.

Karen Balonis testified that she saw Kathie on the night of the murder, about 8:40 p.m., while Karen was doing laundry. They talked until they went back to their respective apartments around 9:00 p.m. About 9:30, Karen went back to the laundry room to check on her laundry. As she was on her way back to her apartment, she thought she heard Kathie's door, which made a unique sound, open or close. She looked, but saw no one outside Kathie's door. Karen returned to her apartment and called Kathie about 9:40 p.m., but got no answer. Shortly after 10:00, as she returned to the laundry room, she encountered appellant and the Toths, who told her that Kathie had been stabbed.

### Rationality of Conviction

 The critical inquiry in a legal-sufficiency challenge is not whether this Court believes the evidence at trial established guilt beyond a reasonable doubt, but whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,*

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Crim.App.1981). In both circumstantial and direct-evidence cases, we review the evidence to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Carlsen v. State*, 654 S.W.2d 444 (Tex.Crim.App.1983).[1] The evidence must exclude every other reasonable hypothesis except the defendant's guilt, even if the evidence leads to a strong suspicion or probability that the defendant committed the offense. *Skelton v. State*, 795 S.W.2d 162, 167 (Tex.Crim.App.1989). If the evidence supports a reasonable hypothesis other than the guilt of the defendant, a finding of guilt beyond a reasonable doubt is not rational. *Denby v. State*, 654 S.W.2d 457, 464 (Tex.Crim.App.1983) (opinion on rehearing). In reviewing the sufficiency of the evidence, we consider all of the evidence, whether properly admitted or not. *Dunn v. State*, 721 S.W.2d 325 (Tex.Crim. App.1986).

■ The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be accorded their testimony. *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex.Crim.App.1974). The jury is free to reject any or all of the evidence presented at trial. *Russeau v. State*, 785 S.W.2d 387, 391 (Tex.Crim.App.1990).

■ We conclude that it was not irrational for the jury to convict appellant based on the evidence presented to them at trial. The jury heard accounts of the evening's events that placed appellant in Kathie Balonis' apartment more than the one time he claimed. There were maintenance records that showed no calls to her apartment. The jury also heard descriptions of her body's position at the scene that differed from appellant's version. Appellant admitted that he had initially lied about the time of his return home. He admitted that he

had falsely claimed that blood on his jeans was pizza sauce. The witness with whom appellant played darts that evening said that she saw no sign of blood or a cut on his hand at a time when he said he had already cut his hand on a package. Appellant claimed to hear noise and see a person leaving in a Vega at the time of the murder, but other people in the vicinity did not.

The forensic evidence presented to the jury placed the victim's blood and saliva on appellant, as well as identifying appellant's blood in the victim's apartment, in locations not consistent with his version of events. Appellant challenges the credibility of Zain's testimony. During the trial, Zain stated that appellant's blood was on the collar of the victim's shirt, a fact that was not revealed in any of his previous written reports. Zain characterized this omission as an "oversight." We do not reweigh the credibility of the witnesses, and whether this mistake as to one sample should affect the rest of Zain's testimony was a matter for the jury.[2]

There was testimony that a man was seen at the apartment complex who fit the description of the man appellant said he saw leaving Kathie Balonis' apartment. In addition, noises were heard in the apartment at a time when Kathie Balonis was not home. However, this testimony, other than appellant's, referred to a time much earlier in the afternoon. In any event, the jury was entitled to believe the State's witnesses' accounts of the events of that day. Because a rational trier of facts could have found the essential elements of the crime beyond a reasonable doubt, we overrule appellant's point of error one; appellant is not entitled to an acquittal.

### PROSECUTORIAL MISCONDUCT

#### Background

In point of error nine, appellant contends that the trial court erred in overruling his

---

1. *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App. 1991), overruling *Carlsen* and its progeny, does not apply to this appeal. *Geesa* specifically stated that *Carlsen* would continue to apply to all cases pending on appeal at the time *Geesa* was handed down, November 6, 1991.

2. Appellant's brief refers to another problem raised in a deposition given by Zain in a civil action and contained in his out-of-time motion for new trial: the blood on some carpet samples was not appellant's, but the victim's blood. That evidence is not before us for review, because it was not part of this trial.

motions for mistrial and for instructed verdict based on prosecutorial misconduct; specifically, appellant complains that the district attorney intimidated a witness and used her perjured testimony. We will sustain this point of error.

The witness in question is Carolyn Toth, the manager of the New Braunfels Oaks Apartments. The testimony in question involved Toth's description of a consolatory embrace between appellant and the victim's sister, Karen Balonis, shortly after the murder was discovered. The significance of the testimony, from appellant's perspective, is that it could explain forensic evidence showing the presence of the victim's blood and saliva in a location on appellant's vest inconsistent with his account of his contact with the victim's body.

Toth testified, on direct examination by the State, concerning the events on the night of the murder and the physical layout of the apartment complex. The building had three sets of stairs: east and west at either end of the building, as well as a middle staircase. Kathie Balonis' apartment was the westernmost apartment on the second floor. On cross-examination, Toth testified that after the discovery of the body and the arrival of police officers, she saw appellant go up the west stairs by the victim's apartment and embrace the victim's sister, Karen, who returned the embrace.

On redirect examination, the district attorney pointed out that two police officers were on the west stairway restricting access to the area of the victim's apartment at the stairway. He asked if appellant might have gone up the middle stairway, and if Toth might have seen him after he arrived at the second floor balcony. Toth replied that when she saw him, he was walking up the stairs by the victim's apartment. The district attorney then asked her if she saw Karen Balonis actually embrace appellant or if she just saw them get close together as if an embrace were going to occur. Toth answered that she saw hands on shoulders in an embrace.

The next day, the State recalled Toth. She was questioned by the district attorney as follows:

Q: Mrs. Toth, after testifying, this morning did you—after testifying, did you contact me, Mrs. Toth, and inform me that you felt that perhaps you had left the wrong impression on some of your testimony?

A: Correct.

Q: You testified yesterday that you saw the defendant go up the stairs to Kathie Balonis' apartment. Did you actually see him go all the way to the top of the stairs or did you just see him start up the stairs?

A: Start.

Q: You never saw him actually come to the top of the stairs?

A: No.

\* \* \* \* \* \*

Q: You also testified yesterday to what, in your mind, you initially thought was an embrace between Karen Balonis and the defendant, Jack Warren Davis; is that correct?

A: Yes, sir.

Q: Now, along that upper balcony, is there a large wooden handrail that goes across there?

A: Correct.

Q: Would that have obstructed your view?

A: Very possibly.

Q: Did you see a concluded embrace, to where the hands of Karen Balonis actually touched the shoulders of Jack Davis, or did you see Jack Davis go around (indicating) and the hands just start up by Karen Balonis?

A: What you said the first time.

Q: You did not see a concluded embrace? But just off of your present-sense impression you just had assumed that it was concluded?

A: When I saw his arms go up around her, I just assumed when I saw her arms they were consoling one another and the arms came up.

Q: In other words, you found there may be a difference between an initial act and a concluded act; is that correct?

A: That's correct.

The State then passed the witness. Defense counsel asked her to explain, in her own words, what differed between her prior testimony and her current testimony. She replied:

That yesterday in my statement, I had thought, when you had asked me the question, I said I thought there was an embrace, they had "consoled each other," is a good choice of words; and when I went home last night and thought about it, thought about the arms coming up, and I saw Jack's arms going around Karen, I saw other arms come up, and it made me think last night maybe it could have been anybody's arms coming up, but it wasn't an embrace where Karen put her arms completely around Jack.

She then said that she did not see Karen's arms go around appellant; and in response to a question whether she saw Karen's arms *start* to go around appellant, she made a gesture which was recorded in the statement of facts as Karen's arms going up to her side. The questioning then moved on to whether anyone had asked her to change her testimony or had threatened her if she did not do so. She said that no one had done so.

### Hearing on Motion for Mistrial

Upon learning that, in between Toth's two rounds of direct testimony, the district attorney had threatened Toth with a grand-jury indictment for perjury if her original testimony about the staircase and the embrace were found to be false, appellant moved for a mistrial on the ground of prosecutorial misconduct. The trial court heard testimony at an informal hearing outside the jury's presence. At this hearing, the district attorney informed the court that after Toth first testified, he reviewed the statements from the various police officers, particularly from the two who said that they had secured the west stairway by the victim's apartment and that appellant had only come halfway up

the stairs. He also reviewed Karen Balonis' testimony that she did not embrace the defendant. He then asked an officer to contact Toth and have her call his office. When she arrived at his office, he told her that there was a conflict between her testimony and that of other witnesses; that if he could not resolve this conflict he would present the matter to the grand jury; and that if the officers had lied he would indict the officers, or "the reverse if she had not told the truth." He also told her that he had "already put one person in jail for lying on the stand last year." He said he then asked her if she might have been mistaken about having seen a completed embrace. She said she had been mistaken.

The trial court then recalled Toth, still outside the presence of the jury, told her that she now had judicial immunity from prosecution for perjury, and assured her that she was not going to jail. The court asked her if she had changed her testimony in response to the district attorney's threat to have her brought before the grand jury. She answered, under oath, "That's why I changed it." She said that the district attorney's manner frightened her; that she felt intimidated by his saying that he had already put one person in jail for lying; that she was afraid he would put her in jail; and that she was now distraught about the matter and had been suffering physically.

After the court finished its questioning of Toth, the district attorney questioned her. During this questioning, Toth became upset, telling the district attorney that he was not allowing her to properly answer the questions and that he had "put me and my life through hell and back, and you can't do this to me." She said that she had been intimidated by his attitude and manner, by his having come unexpectedly onto the apartment complex property one day, and by a police officer who had tried to get her to "ride out in the country" one day to talk about the case. The district attorney also questioned Toth about a lawsuit filed by the victim's estate against the apartment complex, to which she responded that the lawsuit was not her concern because she had not been sued personally.

Defense counsel then questioned Toth. She said the district attorney's office had called her after she first testified and asked her to come in for a talk. She said the only person she called after that was her attorney. She said that after their meeting the district attorney told her on three different occasions that he was going to say in front of the jury that *she* called *him.*

Defense counsel then called Doris R. Simms, Toth's mother, still outside the presence of the jury. Simms said that as she was sitting in the hallway while Toth was waiting to testify for the second time, the district attorney came up to Toth, patted her hand, and told her that he was going to tell the jury that she had called him and said that she had thought about the matter and wanted to change her story. The district attorney said he was attempting to show that the filing of the civil lawsuit against the apartment complex had caused a change in attitude in several witnesses. The district attorney then asked Simms if she was aware of a "quasi feud" between the Balonis sisters and Toth over another tenant. Simms said her daughter had no hard feelings about the matter of this tenant, who eventually was asked to leave.

The district attorney then called Nancy Filkins, an employee in his office, to testify at the hearing. Filkins had been present when Toth came to the office to give her statement of May 1. Filkins said the district attorney had requested Officer Alvarez to ask Toth to come to the office. Filkins said she told the district attorney that Toth had called back, although she herself did not take the call. She was told that Toth would be there in thirty minutes. She said that the district attorney's only knowledge of the phone call was through her, and that she did not see him berate, intimidate, or in any other manner try to coerce Toth during their meeting. Filkins was in the room the entire time. She said the district attorney told Toth that there was a discrepancy between an officer's testimony and hers; that he would go after the officer if he made a misstatement on the stand as well; that Toth did not appear to be extremely upset; that she remained in his office for about an hour and a half and did not express any displeasure about the way in which the contact had been handled; and that he turned on the tape immediately when she came into his office.

Defense counsel then called the district attorney, who said he had not attempted to intimidate Toth; that it was his understanding that Toth had called his office; that he was simply trying to find out if someone was lying or if there was simply a perception problem caused by a tendency to see part of an act and assume its completion; and that he had informed Toth that if anyone involved were lying he would take them to the grand jury. Counsel then asked whether the officers had testified in depositions that appellant was not on the balcony, while Karen Balonis, as well as Toth, had said that he was.

After this hearing, the trial court ruled that there had not been prosecutorial misconduct that would justify a mistrial. The judge said he was going to instruct the jurors that they were not to consider Toth's second round of testimony for any purpose, which he later did. He said the district attorney would be called to a separate hearing to see whether he should have to face sanctions.

## Analysis

■ Under certain circumstances, a judge's or prosecutor's threats or intimidation that dissuade a witness from testifying or persuade a witness to change their testimony may infringe a defendant's due-process rights. *See Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). "It is not improper *per se* for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely." *United States v. Blackwell,* 694 F.2d 1325, 1334 (D.C.Cir. 1982); *accord United States v. Hooks,* 848 F.2d 785, 799 (7th Cir.1988); *United States v. Whittington,* 783 F.2d 1210, 1219 (5th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986); *United States v. Simmons,* 670 F.2d 365, 371 (D.C.Cir. 1982), *cert. denied,* 464 U.S. 835, 104 S.Ct.

121, 78 L.Ed.2d 119 (1983). "But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify." *Blackwell,* 694 F.2d at 1334; *accord Hooks,* 848 F.2d at 799; *United States v. Hammond,* 598 F.2d 1008, 1012–13 (5th Cir.1979); *United States v. Morrison,* 535 F.2d 223, 227–28 (3rd Cir. 1976).

Although there is no bright line of demarcation between proper and improper perjury warnings, we agree with the following comments in a recent opinion by the North Carolina Supreme Court:

> Whether judicial or prosecutorial admonitions to defense or prosecution witnesses violate a defendant's right to due process rests ultimately on the facts in each case. Such admonitions should be administered, if at all, judiciously and cautiously. This is particularly true with regard to prosecutorial conduct because, as here, it generally occurs outside the context of the trial itself, is not a part of the official court proceedings, and is not subject to judicial supervision and control. Witnesses should not be discouraged from testifying freely nor intimidated into altering their testimony....
>
> In all these kinds of cases the reviewing court should examine the circumstances under which a perjury or other similar admonition was made to a witness, the tenor of the warning given, and its likely effect on the witness's intended testimony. If the admonition likely precluded a witness "from making a free and voluntary choice whether or not to testify," *Webb,* 409 U.S. at 98, 93 S.Ct. at 353, 34 L.Ed.2d at 333, or changed the witness's testimony to coincide with the judge's or prosecutor's view of the facts, ... then a defendant's right to due process may have been violated. On the other hand, a warning to a witness made judiciously under circumstances that reasonably indicate a need for it and which has the effect of merely preventing testimony that otherwise would likely have

been perjured does not violate a defendant's right to due process.

*State v. Melvin,* 326 N.C. 173, 388 S.E.2d 72, 79–80 (1990).

■ In the present case, the actions of the district attorney went far beyond a cautious and judicious warning. First, the conversation between the district attorney and Toth occurred outside the context of the trial court and the protection of judicial supervision. Second, it was a personal interview in the district attorney's office, a setting clearly conducive to intimidation. Third, the tenor of the district attorney's comments were more threatening than a simple warning would need to be; for example, the district attorney's remark that he had "already put one person in jail last year for lying" seems designed to intimidate Toth. Finally, the dramatic effect of the meeting on Toth was clearly established, both in the very fact that she changed her testimony and in the reasons she gave for the change.

In response, the State dwells at length on the prosecution's general duty to correct false testimony, attaching to its brief the text of an article on the problem of the "recanting witness."[3] Toth, however, was not a recanting witness in the sense that the State urges. Nowhere in the record of the hearing concerning the district attorney's actions is there any evidence that she voluntarily changed her story before the district attorney told her she faced a possible perjury indictment.

Moreover, although the district attorney referred to his perception of a "change in attitude" on the part of several witnesses after the filing of a lawsuit against the apartment complex (and also attempted to show bad feelings between Toth and the Balonis sisters), his concern with Toth's testimony was simply that it conflicted with statements from other witnesses. It is not unusual for conflicts to exist between eyewitnesses' accounts of events. The claimed discrepancies here seem to be

---

**3.** The material attached was apparently presented at a seminar. It is now published as G. Sarno & J. Douglass, *Recantation: Problems for*

*Prosecutors Before, During and After Trial,* 18 Am.J.Crim.L. 187 (1991).

that type of conflict: did the defendant go all the way up the west stairway or did he use the middle stairway or was he on the second-floor balcony at all? Did he embrace Karen Balonis, did she embrace him back, and, if so, to what degree? The district attorney had the opportunity on recross to elicit the fact that Toth saw appellant start up the stairs, but perhaps did not watch him continuously from the bottom to the top of the stairway. The desired clarification of Toth's testimony could have been handled in the ordinary course of examination and argument. *See Pierce v. State,* 777 S.W.2d 399, 415–16 (Tex.Crim.App.1989), *cert. denied,* 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990) (court properly exercised discretion in excluding expert testimony on eyewitness reliability; jury is qualified to make credibility determination about eyewitnesses, aided by cross-examination and common knowledge of memory and its effect on perception); Annotation, *Admissibility, at Criminal Prosecution, of Expert Testimony on Reliability of Eyewitness Testimony,* 46 A.L.R.4th 1047 (1986) (collecting cases dealing with admissibility of expert testimony on the reliability of eyewitness perceptions and identifications). A private meeting with Toth outside the presence of the trial judge, in which the district attorney boasted of having already sent one person to jail for perjury, was unnecessary and was calculated to intimidate Toth into changing her testimony. We hold that the district attorney's actions were improper.

 Furthermore, the knowing use of perjured testimony by a prosecutor in obtaining a conviction violates a defendant's due-process rights and denies the accused a fair trial. *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Ex parte Adams,* 768 S.W.2d 281, 292 (Tex. Crim.App.1989). In the present case, in addition to the intimidation of Toth, the district attorney knowingly created a false impression for the jury. By asking Toth,

on recall to the stand, whether she had contacted him and informed him that she felt that her earlier testimony had "left the wrong impression," and by allowing her to answer "Correct," the district attorney created the impression that Toth voluntarily returned to his office on her own initiative. We cannot sidestep the problem presented by the prosecutor's conduct by dealing with it as a lapse in communication between him and an employee who told him that Toth had called his office, thus rendering his question to her about the phone call "technically accurate, literally true, and legally true," as the State contends in its brief. The salient point is that the district attorney, by his own admission, *initiated* the contact with Toth and implicitly threatened to prosecute her for perjury if she did not change her testimony. Yet, his presentation in front of the jury was calculated to leave the misimpression that she had contacted his office, by phone, on *her* initiative because she thought her testimony had been misleading. This constitutes the knowing use of perjured testimony.

Nor can we conclude that the district attorney's actions did not prejudice appellant's defense. Toth's original testimony was important for the defense because she saw the embrace between appellant and Karen Balonis, the extent of which could arguably explain how the blood and saliva got on appellant's vest. The trial court instructed the jury to ignore Toth's second round of testimony. A simple instruction, however, could not cure the false impression left by the prosecution that, first, Toth had initiated contact with his office and, second, had voluntarily changed her story. Indeed, the court's instruction may well have inadvertently exacerbated the harm. In light of Toth's changing stories, we think it likely that the court's instruction to ignore *part* of her testimony had the effect of convincing at least some jurors that she was simply not a credible witness and that *all* of her testimony should be ignored.

We hold that the district attorney's actions denied appellant a fair trial and violated appellant's due-process rights. Accordingly, the trial court erred in denying ap-

pellant's motion for mistrial. We sustain appellant's point of error nine.

## SEARCH AND SEIZURE OF BLOOD

In point of error ten, appellant contends that the trial court erred in overruling his objection to evidence obtained as a result of a warrant issued in violation of requirements of the Texas Code of Criminal Procedure. We agree and will also sustain this point of error.

The record shows that a "motion for hair, blood, and sperm samples" was submitted to a magistrate and granted on November 29, 1989. This motion stated that appellant was a suspect in the offense of capital murder and that the State requested an order allowing the police department to acquire samples of blood, body hair, and sperm from him. That portion is signed by the district attorney. An affidavit follows and states:

I, MONTGOMERY KAMA, being over the age of eighteen (18) years and having personal knowledge based upon my investigation of the same do hereby affirm all statements in the above motion are true and correct, and that said defendant JACK DAVIS is a suspect in a Capital Murder case in Comal County, Texas.

The affidavit is followed by an order of the magistrate granting the motion.

■■■ Taking blood is a search and seizure under federal and state law. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Escamilla v. State,* 556 S.W.2d 796 (Tex.Crim.App. 1977). Absent consent, taking a blood sample from a defendant in custody requires a validly obtained warrant. *Smith v. State,* 557 S.W.2d 299, 301–02 (Tex.Crim.App. 1977). A warrant may be issued to search for and seize property or items that are evidence of an offense or which tend to show that a particular person committed an offense. Tex.Code Crim.Proc.Ann. art. 18.-02(10) (Supp.1992). To justify the issuance of a search warrant under article 18.02(10), there must be a supporting affidavit setting out sufficient facts to establish probable cause that a specific offense has been committed, that the specifically described property or items that are to be searched for or seized constitute either evidence of that offense or evidence that a particular person committed that offense, and that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched. Tex.Code.Crim.Proc.Ann. art. 18.01(c) (Supp.1991). *Compare Mulder v. State,* 707 S.W.2d 908, 915–16 (Tex. Crim.App.1986) (affidavit for a search warrant to take a blood sample held insufficient) *with Marquez v. State,* 725 S.W.2d 217, 233–34 (Tex.Crim.App.) (affidavit held sufficient), *cert. denied,* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).

■■■ The affidavit in this cause does not establish probable cause to issue a search warrant. The affidavit itself does not even state that the evidence to be searched for and seized is the defendant's blood. No facts whatsoever are set out in the affidavit to show that the items to be searched for are evidence of a crime or show that the person involved committed the offense. The motion to which the affidavit was attached simply states that appellant is a suspect in the offense and then requests the blood, hair, and sperm samples. The only statement that the affidavit swears is true is that appellant is a suspect in the murder of Kathie Balonis in Comal County.

The State contends that, notwithstanding the inadequacy of the affidavit to establish probable cause for the issuance of the warrant, the evidence should not be excluded because the officers who performed the search did so in good faith, reasonably relying on a warrant issued by a magistrate. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon,* a magistrate issued a facially valid search warrant on the basis of an affidavit that related information obtained from a confidential informant and recited the results of police surveillance of several suspects. Although the district court later found the question to be very close, it held the affidavit to be insufficient because the confidential informant was of unproven reliability; without his information, the events observed during police surveillance were inad-

equate to establish probable cause. Nonetheless, the Supreme Court held that the evidence, because obtained in reasonable, good-faith reliance on a warrant, should not have been excluded.

■ In the present case, the State's first obstacle to the admission of the challenged evidence is the Texas statutory exclusionary rule. Tex.Code Crim.Proc.Ann. art. 38.23 (Supp.1992). Article 38.23(b) creates an exception to the general rule for evidence obtained by a law-enforcement officer acting in objective, good-faith reliance on a warrant issued by a neutral magistrate *based on probable cause.* This statute is not a codification of *Leon,* because it requires a finding of probable cause, while "the exception enunciated in *Leon* appears more flexible in allowing a good faith exception if the officer's belief in probable cause is reasonable." *Gordon v. State,* 801 S.W.2d 899, 913 (Tex.Crim.App.1990); *see also Eatmon v. State,* 738 S.W.2d 723 (Tex.App.1987, pet. ref'd) (statutory good-faith exception inapplicable where search warrant not supported by probable cause); *see also Imo v. State,* 822 S.W.2d 635 (Tex. Crim.App.1991) (defendant who moves to suppress evidence on statutory grounds automatically invokes article 38.23); Robert O. Dawson, *State–Created Exclusionary Rules in Search and Seizure: A Study of the Texas Experience,* 59 Tex.L.Rev. 191 (1981). The present circumstances do not fall within the exception contained in article 38.23(b).

We further conclude that the evidence in question here was not admissible even under *Leon's* more flexible good-faith exception. *Leon* emphasizes that a magistrate must be "detached and neutral," not a rubber stamp for the police. *Leon,* 468 U.S. at 914, 104 S.Ct. at 3416. Moreover, an officer does not manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923, 104 S.Ct. at 3421. These principles enunciated in *Leon* do not permit the admission of the blood sample taken from appellant in the present case. The affidavit on which the warrant was based is completely lacking in facts to support a finding of probable cause. Thus, no reasonable, good-faith reliance by the officers was manifested.

■ The State also contends that this error was not preserved. The State asserts that the record fails to show that appellant ever objected to the blood being admitted into evidence on the specific ground that it was illegally seized or that the affidavit was insufficient to show probable cause, other than in a pretrial motion to suppress. But where, as here, the pretrial motion to suppress is heard and overruled, further objection at trial is unnecessary. Tex.R.App.P. 52(b). Moreover, the trial record shows that after establishing that the officer obtained the blood sample pursuant to the "motion to take blood," defense counsel objected to any evidence seized on the ground that the motion was not a valid search warrant. The district attorney argued that the "good faith exception" allowed admission, and the trial court agreed. When the judge then allowed the district attorney to proceed with expert testimony regarding the blood, counsel again objected. We conclude that appellant properly preserved the error.[4]

We sustain appellant's point of error ten. Moreover, because the evidence relating to the blood sample was important forensic evidence, we are not able to conclude that the error was harmless, i.e., we are not able to determine beyond a reasonable doubt that its erroneous admission made no contribution to the conviction. *See* Tex. R.App.P. 81(b)(2).

---

4. In its brief, the State also displays a general misunderstanding of what must be done to preserve error. A party must complain only until he receives an adverse ruling. *Ramirez v. State,* 815 S.W.2d 636, 643 (Tex.Crim.App.1991). Thus, when an objection is *overruled,* it is not necessary, in order to preserve error, to request an instruction or a mistrial. Only if an objec-tion is *sustained* must the party making the objection then request an instruction, if one is desired. If the instruction is given, the party must then request a mistrial, if one is desired. Otherwise, the objecting party has received all of the relief requested and no harm has been done about which to complain. *Brooks v. State,* 642 S.W.2d 791, 798 (Tex.Crim.App.1982).

## OTHER POINTS OF ERROR

Because we reverse on points nine and ten, we need not address appellant's other points of error. In light of our disposition of the appeal, however, we will discuss some of the other complaints appellant has raised on appeal in order to provide guidance for the trial court in the event of retrial.

### Lost Evidence

Appellant contends that the court erred in overruling his motion to dismiss for due process violations based on the State's negligent investigation of the case (point two) and on the intentional destruction of exculpatory evidence (point three). Appellant points out that photographs and negatives were missing, that hairs found in the victim's hand and mouth were missing, that a tape recording of an interview with the victim's next-door neighbor immediately after the discovery of the body was erased, and that the vials of blood tested by Zain were destroyed.

Three factors are relevant in determining whether the failure to preserve evidence has resulted in a violation of due process: (1) the likelihood that the lost evidence was exculpatory; (2) the likelihood that the defendant was significantly prejudiced at trial by the absence of the evidence; and (3) the level of government culpability. *Gardner v. State,* 745 S.W.2d 955, 958–59 (Tex.App.1988, no pet.); *see also Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Ex parte Brandley,* 781 S.W.2d 886 (Tex.Crim.App. 1989); *State v. Shelton,* 802 S.W.2d 80, 82 (Tex.App.1990, pet. granted). Failure to preserve potentially useful evidence, absent a showing of bad faith on the part of the police, does not, in and of itself, result in a denial of due process of law. *Arizona v. Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337. The accused must show that the police conduct itself indicates that the evidence could form a basis for exonerating the appellant. *Id.*

We do not find in the present record evidence of misconduct sufficient to compel the conclusion that the police or their agents acted in bad faith regarding the failure to preserve evidence. Accordingly, the denial of appellant's motion to dismiss on this basis has not been shown to be error.

### Impeachment

Appellant contends in point of error sixteen that the trial court erred in refusing to permit him to impeach a State's witness as to bias or prejudice. Specifically, he complains that he was not permitted to question the victim's sister about a wrongful-death suit filed by her family against the owners of the apartment complex, even though the State was permitted to question the apartment complex manager about the suit in order to try to show bias on her part.

The Court of Criminal Appeals recently held that in a prosecution for aggravated assault, it was error to prohibit the defendant from cross-examining the victim's mother about a pending suit for damages against the owners of the apartment complex where the assault occurred. *See Shelby v. State,* 819 S.W.2d 544 (Tex.Crim.App. 1991). For the reasons stated in *Shelby,* we conclude that the district court erred by limiting appellant's cross-examination of Karen Balonis on this subject.

### Chain of Custody

In point of error twelve, appellant contends that his right to a fair trial was abrogated by the State's failure to establish and prove the chain of custody of both the victim's and appellant's blood. Specifically, he urges that the State failed to adequately explain the end of the chain of custody. The State asserted that Fred Zain, the scientific expert who tested the blood, retained the vials. Zain testified that he later returned the vials to Detective Guerrero. After appellant's objections to the chain of custody, the State recalled Guerrero, who provided the explanation that after Zain returned the vials of blood to him, they were destroyed.

In general, proof of the chain of custody is vital to the admissibility of evidence if its relevant characteristics are distinguishable only by scientific tests or analyses. *Hammett v. State*, 578 S.W.2d 699, 708 (Tex.Crim.App.1979); *Edlund v. State*, 677 S.W.2d 204, 210 (Tex.App.1984, no pet.). If the State proves the beginning and the end of the chain of custody, any gaps in between usually go to the weight and not the admissibility of the evidence. *Id.* In this case, the State eventually did prove the end of the chain: the officer testified that he received the samples back from the expert and the samples were then destroyed. The credibility of that explanation was a matter for the jury to decide. The implications of the destruction of evidence have been discussed above. We find no merit in point of error twelve.

### Extraneous Offense

Appellant contends that the trial court abused its discretion by permitting the introduction of an alleged extraneous offense into evidence. This point of error relates to the testimony of a resident of the apartment complex that, a few days before the murder, she saw appellant enter the victim's apartment without knocking or turning on lights, even though it was dark outside.

The principles governing the admission of extraneous transactions or offenses have been extensively discussed. *See, e.g., Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App.1990); *Williams v. State*, 662 S.W.2d 344 (Tex.Crim.App.1983); *Albrecht v. State*, 486 S.W.2d 97 (Tex.Crim. App.1972). Among the "exceptions" to the general rule prohibiting the admission of extraneous offenses are: motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Tex.R.Crim.Evid. 404(b). The admissibility of an offense is affected by whether its probative value is substantially outweighed by the danger of unfair prejudice. *Banda v. State*, 768 S.W.2d 294 (Tex.Crim.App.), *cert. denied*, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 270 (1989); Tex.R.Crim.Evid. 403. A major danger in the use of extrane-ous transactions or offenses is that the accused will, in effect, be tried for being a "bad person" rather than for the offense with which he is charged.

In the present cause, the State's use of the extraneous transaction does not appear to be an improper attempt to show that appellant was a bad person with a propensity to commit crimes. Rather, the State offered the resident's testimony in an attempt to show that appellant planned the offense. The prejudicial value of the offense is uncertain—the jury knew that appellant was the maintenance worker at the complex and therefore had access to the apartments. The maintenance logs of the apartment complex had also been introduced by the State and did not agree with appellant's statements about the times he had been in the apartment to do maintenance. Because the extraneous conduct was probative and carried little danger of unfair prejudice, no error is shown.

### Cumulative Error

Although appellant does not raise the issue as a separate point of error, he urges throughout his brief that the cumulative effect of the errors in the investigation and trial of this cause denied him due process of law. *Ex parte Brandley*, 781 S.W.2d 886, 894 (Tex.Crim.App.1989), *cert. denied*, — U.S. —, 111 S.Ct. 61, 112 L.Ed.2d 35 (1990); *Bethany v. State*, 814 S.W.2d 455 (Tex.App.1991, pet. ref'd). We do not reach this contention, as we have found individual errors that require that appellant's conviction be reversed.

It appears to us that appellant's other points of error relate to matters that are not likely to recur in a retrial of this cause; accordingly, we will not address them.

We reverse the judgment of conviction and remand the cause for a new trial.