TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-95-00473-CR





Timothy James Winters, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT


NO. 18,894, HONORABLE CHARLES E. LANCE, JUDGE PRESIDING







 The State prosecuted Timothy Winters, Rashid Muhammad, Trayvonce W. Wright,
and Kenneth Smith for the murder of Wilbert Miller on or about July 27, 1994. (1) The court
instructed the jury to acquit Smith. The jury convicted the remaining defendants and sentenced
Winters to thirty years in prison and a $10,000 fine. Winters raises five points of error, including
his contention that insufficient evidence corroborates the accomplice witness's testimony. We will
affirm the judgment of conviction.

 The only eyewitness account of the murder came from Chris Evans, a participant. 
Evans testified at trial that Muhammad told him that Miller owed Muhammad $500. Evans said
that on an evening in summer 1994, he and the four defendants took Miller from Kathy Pride's
house in a green Buick LeSabre. They got out of the car and Winters held Miller so that
Muhammad and Wright could stab him. Winters next took a knife and stabbed Miller, then Evans
stabbed Miller. The five left Miller to die.

 Several months later, Evans reported finding a skeleton to police. Investigators
eventually identified the skeleton as Miller's remains. Evans initially denied knowing who the
skeleton was. Over the course of several interrogations, his story evolved, increasing his
culpability, until he admitted to delivering the final, fatal stab wound to Miller.

 Because Evans was an accomplice to the murder, his testimony cannot be the basis
for the conviction of others unless it is corroborated by other evidence tending to connect the
defendant with the offense committed; the corroboration cannot merely show commission of the
offense. See Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979).

 We will treat Winters's challenge to the sufficiency of the corroborating evidence
as a challenge to the sufficiency of the evidence to support the verdict. See Munoz v. State, 853
S.W.2d 558, 560 (Tex. Crim. App. 1993) (challenge to sufficiency of corroborating evidence). 
When reviewing the legal sufficiency of the evidence, we view the evidence in the light most
favorable to the verdict, and ask whether any rational trier of fact could have found beyond a
reasonable doubt all of the elements of the offense. Jackson v. Virginia, 443 U.S. 307, 319
(1979); Santellan v. State, 939 S.W.2d 155, 160 (Tex. Crim. App. 1997). When reviewing the
factual sufficiency of the evidence, we view all the evidence without the prism of "in the light
most favorable to the prosecution" and set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Clewis v. State, 922
S.W.2d 126, 129 (Tex. Crim. App. 1996). We must ensure our review does not substantially
intrude on the jury's role as sole judge of the credibility of witnesses. Santellan, 939 S.W.2d at
164.

 We measure the sufficiency of the evidence against the charge given. Gonzales v.
State, 931 S.W.2d 574, 575 (Tex. Crim. App. 1996). The charge instructed the jury to convict
the appellants of murder if it found beyond a reasonable doubt: (a) that appellants intentionally
or knowingly caused Miller's death by stabbing him in the chest and abdomen with a knife; (b)
that appellants, intending to cause serious bodily injury to Miller, committed an act clearly
dangerous to human life by stabbing him in the chest and abdomen, thereby causing his death; or
(c) that any of the appellants knowingly caused Miller's death by stabbing him and that any of the
other appellants knew of the intent to kill and acted with intent to promote or assist the murderer
or murderers in the commission of the offense by encouraging, directing, aiding, or attempting
to aid the commission of the murder. The charge also instructed that, because Evans was an
accomplice to the murder, his testimony could not support appellants' conviction unless it was
corroborated by other evidence tending to connect the appellants with the offense committed; the
corroborating evidence must show more than mere commission of the offense. See Tex. Code
Crim. Proc. Ann. art. 38.14 (West 1979). 

 When reviewing the sufficiency of the corroboration, we must ignore the
accomplice witness's testimony and decide whether other non-accomplice evidence tends to
connect the accused with commission of the crime. Walker v. State, 615 S.W.2d 728, 731-32
(Tex. Crim. App. 1981). We view the corroborating evidence in the light most favorable to the
verdict. Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); Utsey v. State, 921 S.W.2d
451, 453 (Tex. App.--Texarkana 1996, pet. ref'd). The accomplice witness's testimony need not
be entirely corroborated, nor need the corroboration directly link the accused to the crime or be
sufficient in itself to establish guilt. Gill, 873 S.W.2d at 48. Evidence that corroborates what the
accomplice said he and others did but that does not connect the others to the crime cannot be
considered. Walker, 615 S.W.2d at 732 (finding murder weapon where accomplice said they
threw it does not connect other defendants to crime). Evidence that merely shows the commission
of the offense and the joint presence of the accomplice and accused shortly before or after the
offense does not provide sufficient corroboration. Lyman v. State, 540 S.W.2d 711, 714 (Tex.
Crim. App. 1976). Additional evidence can make that evidence sufficient corroboration,
however. Edwards v. State, 427 S.W.2d 629, 633 (Tex. Crim. App. 1968) (otherwise
unexplained presence, shortly after crime, with accomplice in early morning hours in small town
near crime scene, immediate journey to city hundreds of miles south, and pawning of victim's
pistol after crime provided sufficient corroboration).

 Peace officers and scientists testified regarding the discovery of the skeletal remains
and the results of tests involving the remains. The tests showed that the remains were Miller's. 
Fractured ribs and vertebrae were consistent with multiple stab wounds, as were tears in a shirt
found nearby that tests showed likely belonged to the victim. Tests on a knife introduced as a
possible murder weapon showed nothing linking it to the victim or the appellants. Department of
Public Safety crime laboratory chemist Steve Robertson opined that, because the knife in evidence
likely did not make some of the tears in the shirt, a second weapon probably was used in the
murder. Examination of Wright's car revealed no hairs or fibers matching the victim or his
clothing. No physical evidence linked appellants to the victim.

 Some of Miller's friends and family testified that he was selling drugs. A cousin
found crack and powder cocaine in his room. An uncle testified that he flushed the powder down
the toilet; the uncle testified that he knew of no connection between the drug sales and the
appellants. Other witnesses testified that they never saw Miller sell drugs.

 An investigating police officer testified that Winters's commander at Fort Sam
Houston told him that Winters worked the shift that left at 4:30 p.m. on the alleged day of the
murder.

 Pascual Murillo, the officer who assisted in the arrest of Winters, testified that,
upon his arrest, Winters acknowledged that he knew why he was being arrested. Winters
volunteered that, while he was in Rockdale, his brother had pulled a knife and killed someone. 
He stated that he did not do it.

 Virgil Crawford testified that he sold drugs with Smith and the appellants. 
Crawford said he had last seen the victim with the appellants at Kathy Pride's house and that
Muhammad said he was going to "fuck [Miller] up if he didn't have the money" for some drugs
he had advanced to Miller. Crawford said he left the house because he felt something bad was
going to happen. He never saw Miller alive again.

 Pride testified that she had seen the appellants, Crawford, and Evans at her house,
but never all at once. She recalled appellants and the victim being at her house together. She
testified that, if Miller had "crossed" the appellants, she believed they would harm him. She also
testified, however, that the appellants and the victim were on friendly terms the last time she saw
them. She said she knew of no connection between the appellants and the murder.

 April Knight, Pride's niece, gave confusing and contradictory statements and
testimony. She gave two written statements to police, the second of which was admitted at trial. 
She testified before the grand jury and at the trial.

 In the admitted second statement, Knight said that in the late summer of 1994, the
appellants, Smith, the victim, and Evans left her aunt's house after dark in Wright's green car. 
Knight never saw Miller again. After an hour, the appellants and Smith returned. The appellants
remained outside talking about killing someone, but acted like they did not want her to hear. 
Smith appeared upset and in shock. Knight said Miller was selling drugs for Muhammad and
Wright, but "got crossways" with them over some dope, probably by not paying them for some
dope that they had fronted him. Sometime later, Smith told her he was present when Miller was
murdered. He did not tell her who did the killing, but said he tried to dissuade them and just
watched.

 At trial, Knight testified that the four defendants sold drugs at Pride's house. She
first testified that she never saw Miller, her cousin, sell drugs; when directed to read her second
statement to police, she recalled seeing Miller sell drugs for Wright. She testified that she knew
of no problem between Miller and the defendants; when directed to read her second statement,
she acknowledged that she had said that there was a problem, but recanted that assertion. She
nevertheless maintained that Miller owed the appellants money for drugs. She then stated that
Miller had sold drugs for four or five years before the appellants ever came to Rockdale, while
admitting that she had only minutes before denied ever seeing him sell drugs. She said that, on
the night Miller disappeared, all four defendants were at the house where she lived with her aunt,
Kathy Pride; she said Miller showed up briefly and left alone, though she had said in her second
statement that he left with the defendants. She said she was scared when she gave the second
statement and simply went along with what the officers told her had occurred. She denied that
Smith told her he was present when Miller was killed, while acknowledging that she had testified
before the grand jury he had done so. 

 At that point, the trial court excused the jury and admonished Knight concerning
aggravated perjury, a felony offense for which she could be imprisoned for ten years and fined
$10,000. He noted that her grand jury testimony and her trial testimony conflicted and could not
both be true. He told her he "did not like to have people come in here and take a solemn oath
before God and this Court and then lie. I'm sick of it. . . . I suggest strongly that you start telling
this Court the truth." He then asked her why she had lied. When she said she did not know, the
court replied, "Give me a break."

 When testimony resumed and Knight was confronted with a contradiction between
her trial testimony and her grand jury testimony, Knight deferred to her grand jury testimony that
the appellants visited every weekend. She conformed her testimony about who she saw getting
into a car on the night of the murder to the version in her second statement; she said the
defendants, the victim, and Evans got into the car, but that only the defendants returned. She
again denied that Smith told her about the stabbing but, when confronted with her second
statement to police that he had, she said that he had told her about the stabbing. (The court
limited that testimony about Smith's assertion to use against Smith.) After again giving contrary
testimony on whether he told her he was present when Miller was stabbed, she stated that her
testimony that he had not told her he was present was false.

 On cross examination, Knight said the police threatened to take her baby away from
her if she did not tell the truth in her statements to them; she said she therefore told the police
what they wanted to hear. She denied telling Virgil Crawford that the appellants killed Miller;
she said Crawford might lie. She said she never saw Miller afraid of appellants. She denied
being told or knowing who killed Miller. When asked what the truth was, she said she did not
know. Knight then reasserted her original statement to police that the last time she saw Miller he
was walking alone, and said that in her second statement she only went along with the "official
version" that he got into the car with the appellants. She said she never saw the defendants sell
powdered cocaine; if Miller had some, it was not from them. She said that the defendants were
not in Wright's green car but in a rented car the last time they were in Rockdale. She said that
the second statement was the police's words, not hers; she said the second statement was the truth,
but that she merely went by what they told her, not what she knew.

 On redirect examination, Knight said the second statement was not the truth, that
she never saw the defendants and Miller get into the car, and that Smith told her nothing. She
admitted that some of her grand jury testimony was false. She said she could not remember when
she last saw Miller. Though she testified that the appellants did not come to Rockdale during June
or July, she admitted she was not in Rockdale then and would not know if they had. On recross
examination, however, she said she visited on weekends. She said that the police kept insisting
that she tell the truth, when the truth was that she did not know anything about the murder.

 At the close of her redirect examination, the State offered Knight's second
statement to police in evidence. It was admitted without objection or limitation. The instruction
in the jury charge, limiting the consideration of evidence "that was admitted solely against
Kenneth Smith" to use only against Kenneth Smith, does not limit the use of evidence admitted
without limitation. On request, the court limited a particular part of Knight's testimony about
what Smith told her, but that limitation did not apply to the typed statement that was later admitted
without objection or limitation. (2)

 Winters argues that, even if Knight's relation of Smith's statements was admitted
for all purposes, Smith's statements are themselves accomplice testimony and cannot be used to
corroborate Evans's testimony. The court of criminal appeals has decided that issue contrary to
Winters's position. Bingham v. State, 913 S.W.2d 208, 211 (Tex. Crim. App. 1995) (op. on
reh'g). Only the in-court testimony of accomplices is subject to the corroboration requirement
of the accomplice-witness statute. Id. 

 Viewed most favorably to the verdict, the evidence is legally sufficient to support
the conviction. Evans's testimony is easily sufficient if corroborated. Crawford's testimony
suggests a motive and intent to kill by Muhammad that immediately precedes Miller's
disappearance. The destruction of the drugs by Miller's relatives further corroborates Evans's
testimony. Knight's testimony and written statement, viewed most favorably to the verdict, show
appellants with the victim shortly before the murder, their motivation to kill him, their discussion
of murder after their return without Miller, and Miller's coincidental disappearance. Her relation
of Smith's admissions is somewhat corroborative, but not decisive because he did not tell her who
did the killing; it does, however, place all appellants at the murder scene. Murillo's testimony
also shows Winters's knowledge about the stabbing; while it explicitly denies his actually stabbing
Miller, it does not address whether he participated in the slaying. The corroboration allows us
to consider Evans's testimony, which provides legally sufficient evidence for every element in the
murder charge.

 The evidence is also factually sufficient to support the conviction. While Knight's
vacillation gives us some pause, the jury is the sole judge of the credibility of witnesses and can
believe or disbelieve all or any part of her testimony. Evans's testimony provides ample evidence
to support the conviction. We cannot say that the verdict was so against the overwhelming weight
of the evidence as to render it clearly wrong and unjust. We overrule point one.

 By point of error two, Winters contends the court erred by improperly interfering
with the testimony by threatening State's witnesses when the testimony was contrary to the
prosecution. Winters asserts that the trial court sided with the State by "admonishing the
witnesses when the evidence was not coming across favorable to the State." We must examine
the circumstances under which the warning was given, the tenor of the warning, and its likely
effect on the witness's intended testimony. Davis v. State, 831 S.W.2d 426, 437 (Tex.
App.--Austin 1992, pet. ref'd). If the admonition changed the witness's testimony to conform with
the judge's or prosecutor's view of the facts, then a due-process violation may have occurred; a
warning given when needed to prevent likely perjury does not violate due process rights. Id. at
437-38. The admonition of Knight, summarized above, was clearly justified by her repeated
contradictions of previous sworn testimony, even testimony she had given only moments before. 
The stern warning had a negligible effect; the testimony she gave immediately after the warning
was most affected by the warning and it provided no material information not elicited (and
contradicted) elsewhere. Similarly, the warnings given to Anthony Miller seemed to have little
clarifying effect on his testimony and caused no swing to the State's side. Even one of the
appellants' lawyers noted in a question to him that "we're having some difficulty here today
getting the truth of what you're trying to tell us." Anthony Miller's responses to some of the
court's questions during the court's interrogation/warning outside the presence of the jury, which
conflicted with some testimony before the jury, provided impeachment material for one of the
appellants. These witnesses' persistent vacillations and repeated changes in testimony provided
a proper impetus for the court's warnings against perjury. We conclude that the trial court's
admonitions did not harm Winters. We overrule point two.

 By point of error three, Winters contends the court erred by denying his motions
to sever his trial from those of his codefendants. The statute grants a court discretion to decide
whether to try multiple defendants charged with offenses growing out of the same transaction
together or separately. Tex. Code Crim. Proc. Ann. art. 36.09 (West 1981). If a joint trial
would be prejudicial to a defendant or defendants, the court must order a severance as to the
defendant whose joint trial would prejudice the other defendant or defendants. Id. Appellate
courts will find the trial court abused its discretion in refusing a motion to sever only when the
defendant satisfies the "heavy burden" of showing clear prejudice. Metoyer v. State, 860 S.W.2d
673, 679 (Tex. App.--Fort Worth 1993, pet. ref'd).

 Winters moved for severance before trial and reurged his motion several times
during trial. Before trial, Winters said he feared conflicting defenses and the unavailability of
codefendants to testify in a single trial to substantiate his alibi defense. He presented no
conflicting defenses, testimony summaries, or proof that codefendants would not testify. During
trial he reurged his motion four times: (3)


 when the State tried to query Crawford on what defendants said to him while in jail; the
court denied the motion, but did not allow the State to pursue the line of questioning at that
time. 


 when the State called a witness to testify about gang affiliation and tattoos on Muhammad. 
The witness testified that Muhammad's tattoos showed that he was a member of a set of
the Crips gang who dealt drugs; the witness also testified that there were gang members
in the military in San Antonio. The witness also testified that Wright's tattoo disrespected
a rival gang. He testified that gangs deal drugs and kill those who cross them. On cross
examination, he admitted that not all gang members deal drugs and that he had no specific
information about any gang activities by Wright or Muhammad. He did not testify
regarding whether Winters was a gang member. 


 when the State sought to introduce a statement by Smith in which he claimed he never left
San Antonio during the summer of 1994 because he was working six twelve-hour days per
week and sleeping the seventh. The basis of the motion appears to be that he could not
examine Smith on its veracity. Smith's counsel examined the police officer who took the
statement and elicited the admission that investigation had shown Smith worked different
dates than he put in his statement. 


 when the State sought to query James Wells regarding a conversation with Muhammad
about a car. The court never ruled on the motion to sever, but sustained objections to
admission of statements about the conversation, thus ending the examination.



 The court did not abuse its discretion by denying the motion because Winters failed
to show prejudice from a joint trial. Before trial, he made no showing of prejudice. The first and
fourth times he reurged the motion, the court stopped the State from pursuing the purportedly
prejudicial lines of questioning. In the second instance, there was no showing of special prejudice
from the joint trial. Though he may have been tainted by the broad brush of the gang affiliation
of his codefendants, he made no showing that such information would not have been admissible
in his separate trial; the taint arose from his choice to associate with them, not because of the trial
format. In the third instance, the veracity of the admitted statement was undermined without the
need to call Smith. We overrule point three.

 By his fourth point of error, Winters contends the trial court erred by interjecting
objections sua sponte during his questioning of the witnesses. He contends the court's action
constituted an impermissible comment on the weight of the evidence that deprived him of a fair
trial and due process. Winters cites five instances:


 when the court questioned the relevance of a line of Winters's counsel's questions
regarding the nature, number, and length of police interrogations of various subjects and
noted that it was far afield from the scope of redirect examination; the court, however,
allowed the line of questioning to continue. 


 when the court interrupted after Winters's counsel asked the police chief whether Knight
was telling the truth; the court deemed the question an improper incursion on the jury's
role, but allowed the question and answer of "Reluctantly and partially, yes." 

 

 when the court, hearing Wright's counsel ask Anthony Miller (who was not in the army
or shown to be aware of army policy) whether he thought the army would allow a soldier
to wear "twigs" in his hair, instructed counsel to "move to something relevant, as opposed
to what this person thinks about Army policy." 


 when the court sustained two general objections by the State and provided its own basis
for the validity of the objection.


 when a defendant objected to the State's offer of the written statement of a witness who
had just testified, the court said, "I assume you're offering it under rule 803, Past
Recollection Recorded?" After the State responded affirmatively, the court allowed the
State to read it into the record, but did not allow it to be taken to the jury room.



Neither Winters nor any other party objected contemporaneously to these actions. Therefore,
nothing was preserved for review. Tex. R. App. P. 52. 

 Even if error had been preserved, we find no reversible error. The first instance
questioned the scope of redirect, but did not comment on the relevance of the questions or weight
to be given the responses. Likewise, the statement in the second instance that the question
encroached on the jury's role gave no guidance on how to resolve the issue. In both instances,
the court allowed the questions and answers. The question regarding Army hair policy, the only
cited question the court disallowed sua sponte, was so minimally probative that its disallowance
was immaterial. In the fourth and fifth instances, the trial court merely stated the basis on which
it excluded or admitted evidence; that does not show harmful bias. The court did not interpose
the objections itself, or prompt the offer of the writing. The court simply stated a proper ground
supporting its ruling on the objections and, when offered a recorded statement, asked if the State
was offering it under the exception for recorded recollections. These actions may show an
impatience with the laborious process of trying four defendants together, but do not show bias in
favor of the State's case. Only the remark concerning the hair question constituted a comment
on the evidence, and that evidence was not probative of issues for the jury's decision. We
overrule point four.

 By his fifth point of error, Winters contends the trial court erred by restricting
recross examination to matters covered during redirect examination. The confrontation clause of
the constitution forms the basis of the right to conduct cross examination. Dedesma v. State, 806
S.W.2d 928, 930 (Tex. App.--Corpus Christi 1991, pet. ref'd). The right to confront is generally
protected when the defense has a full and fair opportunity to probe and expose infirmities in
witnesses' testimony through cross examination. Id. Winters cites instances in which recross
examination was cut short: 


 Muhammad's attorney was prevented from asking the police chief about the size of the
sewer plant and whether he found out when maintenance workers went into the nearby
field where the skeleton was found.

 

 Smith's attorney was prevented from asking Crawford whether he ever stole anything from
Wal-Mart.

 

 the prosecutor was prevented from conducting re-redirect examination of the police chief;
there was, accordingly, no re-recross examination.



None of these instances involved initial cross examination, just recross examination. None of
these instances involved Winters. Nor does he show that he (or any other defendant) was
prevented from recalling any of these witnesses; indeed, the State later recalled the police chief
without hindrance from the trial court, and Winters again cross examined the chief. We fail to
see how denying the State a re-redirect examination prevents a defendant from confronting a
witness on whom he has conducted cross examination, recross examination, and further recross
examination. Winters has not shown how the court's limitation impinged on his right to
confrontation. We overrule point five.

 Having overruled all five points of error, we affirm the judgment.



 


 Marilyn Aboussie, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: July 24, 1997

Do Not Publish

1. Muhammad and Wright appeal their respective convictions in Cause Nos. 03-95-00474-CR
and 03-95-00475-CR also decided this date. We will refer to them and Winters collectively as
"appellants." The three appellants were tried together, and we refer to our other two opinions
for a full recitation of the facts and evidence. The term "defendants" includes the appellants and
Smith.
2. The exchange leading to the limiting instruction was as follows:


 Q. And even though in that [second] statement you say that "Kenneth [Smith]
told me that he was there with 'Rock,' 'T-Top,' 'Tray Man,' and Chris
Evans, you're now telling us he didn't say that? Can you answer that
question?

 A. Yes. 

 Q. Did he tell you that or did he not tell you that?

 A. Yeah, he told me that.

 Q. He told you that?

 A. Yeah.


Defense counsel then raised his objection, which was overruled, and requested an instruction
limiting use of that statement to use against Smith, which was given. This exchange occurred long
before the State offered the statement itself into evidence.
3. Winters cites a fifth time, but that instance occurred away from the jury and related to
testimony from a proposed witness. He reurged the motion when the witness, the gang expert,
was actually on the stand.


s covered during redirect examination. The confrontation clause of
the constitution forms the basis of the right to conduct cross examination. Dedesma v. State, 806
S.W.2d 928, 930 (Tex. App.--Corpus Christi 1991, pet. ref'd). The right to confront is generally
protected when the defense has a full and fair opportunity to probe and expose infirmities in
witnesses' testimony through cross examination. Id. Winters cites instances in which recross
examination was cut short: 


 Muhammad's attorney was prevented from asking the police chief about the size of the
sewer plant and whether he found out when maintenance workers went into the nearby
field where the skeleton was found.

 

 Smith's attorney was prevented from asking Crawford whether he ever stole anything from
Wal-Mart.

 

 the prosecutor was prevented from conducting re-redirect examination of the police chief;
there was, accordingly, no re-recross examination.



None of these instances involved initial cross examination, just recross examination. None of
these instances involved Winters. Nor does he show that he (or any other defendant) was
prevented from recalling any of these witnesses; indeed, the State later recalled the police chief
without hindrance from the trial court, and Winters again cross examined the chief. We fail to
see how denying the State a re-redirect examination prevents a defendant from confronting a
witness on whom he has conducted cross examination, recross examination, and further recross
examination. Winters has not shown how the court's limitation impinged on his right to
confrontation. We overrule point five.

 Having overruled all five points of error, we affirm the judgment.



 


 Marilyn Aboussie, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Affirmed

Filed: July 24, 1997

Do Not Publish

1. Muhammad and Wright appeal their respective convictions in Cause Nos. 03-95-00474-CR
and 03-95-00475-CR also decided this date. We will refer to them and Winters collectively as
"appellants." The three appellants were tried together, and we refer to our other two opinions
for a full recitation of the facts and evidence. The term "defendants" includes the appellants and
Smith.
2. The exchange leading to the limiting instruction was as follows:


 Q. And even though in that [second] statement you say that "Kenneth [Smith]
told me that he was there with 'Rock,' 'T-Top,' 'Tray Man,' and Chris
Evans, you're now telling us he didn't say that? Can you answer that
question?

 A. Yes. 

 Q. Did he tell you that or did he not tell you that?

 A. Yeah, he told me that.

 Q. He told you that?

 A. Yeah.


Defense counsel then raised his objection, which was overruled, and requested an instruction
limiting use of that statement to use against Smith, which was given. This exchange occurred long
before the