NO. 07-05-0117-CR





IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



APRIL 7, 2005
 

______________________________



Ex parte HARLAND P. KENYON, 


 Appellant

_________________________________



FROM THE 154TH DISTRICT COURT OF LAMB COUNTY;



NO. 16,536; HON. FELIX KLEIN, PRESIDING


_______________________________



Order of Dismissal


_______________________________



Before QUINN, REAVIS, and CAMPBELL, JJ.

 Harland P. Kenyon appeals from an order dismissing his application for writ of
habeas corpus. The writ was sought to obtain release from the purported restraint of Bruce
Peel, mayor of Littlefield, Texas. Peel had moved for dismissal, contending that the trial
court lacked jurisdiction over the proceedings. The trial court granted the motion. We now
dismiss the appeal for lack of jurisdiction.

 One may not appeal from an order denying a writ of habeas corpus unless the order
arose after a hearing on the merits and the trial court denied the application on the merits. 
Ex parte Hargett, 819 S.W.2d 866, 868 (Tex. Crim. App. 1991). Next, granting a motion
to dismiss due to the absence of jurisdiction is not a ruling on the merits. See Bland Indep.
Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000); see also City of Lubbock v. Rule, 68
S.W.3d 853, 857 (Tex. App.-Amarillo 2002, no pet.). So because the trial court dismissed
the appeal due to the lack of jurisdiction, we ourselves have no jurisdiction over the appeal. 
Accordingly, the appeal is dismissed for want of jurisdiction.

 


 Brian Quinn

 Justice


Do not publish.


 



resenting his fifth-point contention that the evidence was
insufficient to support his conviction, appellant specifically
challenges the legal sufficiency of the evidence under the standard
of review announced in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct.
2781, 61 L.Ed.2d 560 (1979), to prove that he was at the scene and
committed the offense. We, therefore, must view the evidence in
the light most favorable to the verdict to determine whether any
rational trier of fact could have found these essential elements of
the crime beyond a reasonable doubt. Id. at 319. 


 Undertaking a review of the evidence, we do not reevaluate the
truthfulness or probative value of the evidence. Fernandez v.
State, 805 S.W.2d 451, 456 (Tex.Cr.App. 1991). Rather, we accord
deference to the jury's right to believe or reject all or some
portion of the testimony of each witness, including appellant. 
Gipson v. State, 819 S.W.2d 890, 892 (Tex.App.--Dallas 1991),
aff'd, 844 S.W.2d 738 (Tex.Cr.App. 1992).


 The record evidence reveals that on 27 February 1994,
appellant was not of age to purchase a firearm, but felt he needed
one because of threats to and attempts on his life by others. With
the aid of Bobby McKinley, who purchased the firearm at appellant's
request, appellant obtained a Cobra model M-12 .380 caliber pistol
(the M-12) one day prior to the imposition of the waiting period
for the purchase of firearms.


 Patsy Scott testified that on 3 March 1994, she and her
husband, Robert (Bob) Scott, the victim, had been shopping for a
fish-fry party to be given at their home. Although they had been
out of town, news reports made the Scotts aware of recent driveway
robberies. As they drove toward their home at 8:30 p.m., Bob asked
Patsy to look behind to see if anyone was following them.

 

 A two-toned pick-up truck was following the Scotts, but as
they turned into their residential neighborhood, the street curved,
and Patsy no longer saw the truck. When shown the State's
photograph of a brown and beige two-toned Chevrolet truck, she
identified it as being similar to the one she saw.


 When the Scotts pulled into the alley entrance of their home,
and before they could retrieve their packages from the trunk of the
car, a young black man, nicely dressed and wearing a brown leather
bomber jacket, approached Patsy on the passenger's side of the car. 
He grabbed her around the neck, stood behind her, poked a gun in
the side of her face, and said, "Give me them rings," as he tugged
on her left hand. Patsy gave him her watch and the three rings she
was wearing, viz., a gold wedding band, a solitaire with a diamond
guard, and a diamond dinner ring. 


 Bob ran into the alley and screamed for help. As the robber
left Patsy and walked toward Bob, Patsy advised, "Give him your
rings. We don't care." Bob took off his jewelry and handed it to
the robber. As he did so, the magazine clip fell out of the gun
the robber was holding and the ammunition scattered along the
alley. The robber picked up the clip and some of the bullets and
began "charging towards" Bob saying, "You're trying to mess me up,"
and shot him once in the head. Bob died the following day as a
result of his wound.


 Patsy identified the M-12 as being similar to the gun the
robber used to kill her husband. Although she was unable to
identify appellant from either photographic or live lineups, her
description of the attacker produced drawn pictures which resembled
appellant from both her daughter and a police sketch artist. 
Despite Patsy's inability to identify the attacker with complete
certainty, when her recollections were compared to appellant in
open court, his features were not different.


 Lannie Emanuel, a ballistics expert, testified that the
cartridge casing found in the Scott's alley was consistent with the
magazine on the M-12. (3) He stated that the casing was fired from
the M-12 "to the exclusion of all other weapons."


 Derrick Patterson, appellant's friend since childhood,
testified that he pawned a ring at appellant's request. Appellant
gave him a ring, and after he pawned it for $530, he watched
appellant give part of the proceeds to his companion Ricky
Beasley. (4) The ring was retrieved from the pawn shop and introduced
into evidence as Patsy's diamond dinner ring.


 Patterson confirmed that the State's photograph of the brown
and beige two-toned pick-up truck was a picture of the truck which
belonged to appellant's father, and was primarily driven by
appellant since his vehicle was not running properly. Patterson
had been an occupant of the truck many times since February 27, and
had frequently seen the M-12 in the truck.


 Tracy Patterson, Derrick Patterson's sister and also a friend
of appellant's, testified that she too pawned some rings for
appellant. Appellant paid her $10 for pawning two rings. When she
asked for more money, he told her he "had to split the money with
his partner," and refused her request.


 Several days after Bob Scott's murder, police officers looking
for Beasley pulled over a brown and beige two-toned pick-up truck
driven by appellant, and later determined to be registered to
appellant's father. When Beasley exited the vehicle, officer G.
Francis handcuffed him and took him into custody on parole
violation charges. Through the open door of the pick-up, Francis
saw the M-12, with the clip in, on the floor and yelled the warning
"gun" to his partner, Alejandro Villerreal. For safety, Villerreal
conducted a pat-down search of appellant and the second passenger,
Beasley's brother.


 The search of appellant revealed a second magazine clip
compatible with the M-12, and a bag of marihuana. Appellant was
arrested on drug-related charges.


 Homicide Detective Jerry King testified that after appellant
was released from custody on the marihuana charge, he was
rearrested and placed in an interrogation room. When the detective
entered to talk with appellant, he saw appellant standing on a
table directly beneath a hole in the ceiling with a piece of
ceiling molding in his hand. Appellant does not dispute that while
left alone in an interrogation room, he bored a hole in the
ceiling; however, he testified that he did not try to get out
through the hole, he merely bored it open. (5)


 While in police custody, appellant participated in a lineup
with several other men, including Jerome Hall and Tashambry Rodney
Hollins. Hollins testified that appellant piqued their curiosity
because 



 the majority of the individuals, we was -- already had
been currently incarcerated at the Government Center. So
he [appellant] was the only one that was loose. So we
started asking him what he was in here for. And he asked
us, didn't we know. Didn't we see him on television. 
And I told him no. 


Conversing with the group, appellant inquired whether anyone had
"ever killed a white man before." Jerome Hall offered the only
response, a negative one. 


 Appellant described for Hollins in some detail his encounter
with the victim's wife, relating that he had put a gun to "the
bitch's head" and asked her to "turn over some rings." On three
occasions, Hollins directly asked appellant if he "committed this
crime." Appellant's first response was silence, then he claimed he
did not know and, finally, he said he did. There was no question
in Hollins's mind that appellant murdered a white man.


 Stacy Whetstone and her sister, Tracy Whetstone, who dated
Beasley for ten years, placed the arrival of Beasley and appellant
in a brown and beige truck at their apartment in the vicinity of 10
p.m. on the day of the murder. Stacy said that three or four days
after the murder of Bob Scott, she saw Beasley and appellant in a
beige and brown pick-up truck, driven by appellant, at a drive-in
restaurant. She asked the two men if they were "the ones that
killed that guy, Mr. Scott. And . . . why did they have to do it." 
Beasley replied, "I don't know. That is just the way it went." 
Appellant responded, "Yeah man, I did."


 Testifying on behalf of appellant, Vanessa Littleton said that
appellant was at a "bar-b-que" at her home almost every night until
March 10; however, she admitted that appellant normally would come
in the daytime, leave, and then return after her boyfriend left.
She was not positive about the night of 3 March 1994, and could not
account for appellant's whereabouts at the time of Scott's murder.


 Admitting that he caused McKinley to buy the M-12 for him,
appellant testified he gave the gun to Beasley to keep. He stated
he was with "Vanessa" (6) the night of the shooting between 6:00 p.m.
and 5 a.m. the following morning, because Beasley had taken his
father's truck and, failing to return as agreed, returned instead
the following morning. He said that when he was questioned by
Detective Bobby Hammer, he told Hammer that he did not kill Scott. 
He denied ever meeting Stacy or Tracy Whetstone and telling Hollins
or Whetstone that he killed Scott.


 In rebuttal, the State marshalled testimony from Glenda Conn
and Debra Hart as signature extraneous offenses by appellant in the
attempted robbery and robbery of their respective jewelry. (7) Both
women positively identified appellant in live lineups near the time
of the offenses and in open court as the malefactor of the offenses
against them.


 Conn testified that on 19 January 1994, after pulling into the
alley entry of her home, she began gathering office files from the
car seat. When she looked up, a young, nicely dressed, nice
looking, black man was standing at her car door. He put a small
gun to her head, and as he demanded her rings, he tugged on her
left hand. Conn resisted by tightly gripping the steering wheel
and repeatedly blowing the horn of her car. The man put the gun
away and began "grappling" with her hands. Unable to get her
rings, he ran away.


 Hart testified that on 27 February 1994, she and her husband
returned home from a church meeting and pulled into the alley
entrance of their home. As she was gathering her things from the
floor of the car, she heard voices. When she looked up, she saw a
young, nicely dressed, black man holding a gun on her husband, and
saw her husband drop to his knees. Although she could not hear
what was being said at that point, she testified that she later
determined her husband was praying. Then, the robber came to the
passenger-side of the car where she was sitting, opened the door,
took her purse, and said, "Give me those rings." Hart complied
and, at the robber's request, also gave him the car telephone. 
Hart identified appellant as the robber and the M-12 as the gun
used in the robbery.


 The police retrieved Hart's jewelry from a pawn shop. The
pawn ticket was signed, "Derek Haggerty."


 The State recalled Detective Hammer, whose testimony of a
statement made to him by appellant on March 25 was admitted for
purposes of impeachment. According to the detective, appellant
stated that he had been present during the Scott murder, but stayed
outside the garage. Appellant said that Beasley confronted the
Scotts, took her jewelry and shot Scott. He told Hammer that if
Mrs. Scott could identify him, it was only from when he ran to pick
up the magazine which had dropped to the ground. Hammer reported
that appellant never said he was at Vanessa's at the time of the
murder.


 Again testifying, appellant said that on March 25 Hammer told
him he had been identified by fingerprints on soda cans near the
crime, that Hammer would recommend the death penalty, and that Mrs.
Scott could identify him. He knew Hammer was not serious because
he was not at the scene and knew his fingerprints were not there. 
He told Hammer he did not see the offense. He requested Hammer get
his lawyer, but Hammer refused, telling him he did not need to
waste his hard-earned money on an attorney. Appellant stated he
was kept for three hours while Hammer tried to get him to "sign his
life away," and then he was handcuffed at the wrists and ankles and
told to lay on the floor. He admitted pawning the rings taken from
Hart, but said he got the rings from Beasley. 


 The jury, disbelieving the evidence of appellant's alibi and
apparent implication of Beasley as a solitary actor in the robbery
and murder of Bob Scott, as it was entitled to do, Russeau v.
State, 785 S.W.2d 387, 391 (Tex.Cr.App. 1990), found appellant
guilty of capital murder. (8) Considering the evidence placing
appellant at and connecting him with the scene, i.e., the
similarity of his features with those of the man Patsy recollected
as the man who killed her husband both in the sketches and
comparisons in open court; the positive identification of him as
the man who committed similar acts, Montgomery v. State, 810 S.W.2d
372, 387 (Tex.Cr.App. 1991); his possession of the murder weapon,
Madden v. State, 799 S.W.2d 683, 691-92 (Tex.Cr.App. 1990), cert.
denied, 499 U.S. 954, 111 S.Ct. 2912, 130 L.Ed.2d 1078 (1995); his
possession of the stolen jewelry, see Price v. State, 902 S.W.2d
677, 680 (Tex.App.--Amarillo 1995, no pet'n); and his confessions
to Hollins and Stacy Whetstone, Fisher v. State, 851 S.W.2d 298,
304 (Tex.Cr.App. 1993), in the light most favorable to the jury's
verdict, any rational trier of fact could have found the State
proved appellant's identity as the miscreant who committed the
charged offense. Additionally, his attempted flight from custody
was probative of his guilt. Fentis v. State, 582 S.W.2d 779, 781
(Tex.Cr.App. 1976). His fifth point of error is overruled. (9)


 Appellant contends by his second point of error that the trial
court intimidated Bobby McKinley so as to cause him to change his
testimony. In so contending, he asserts that the trial court's
statements transcended the standards for admonitions stated in
Davis v. State, 831 S.W.2d 426 (Tex.App.--Austin 1992, pet'n
ref'd), one of which is that under certain circumstances, a judge's
intimidation that persuades a witness to change his testimony may
infringe a defendant's due process rights. Id. at 437.


 The alleged intimidation and change of testimony arose in
connection with McKinley's testimony that when he told appellant he
would report the gun stolen if he did not get it back, because it
was his gun and he did not want to be blamed if something happened, 
appellant said he "had let somebody use the gun, and they had used
it in something." McKinley added that appellant said, "[S]omebody
used it. He didn't say he done it. He said somebody done it," and
he said, "Don't report the gun stolen." When the prosecutor asked
"was he [appellant] begging you to not report the gun stolen,"
McKinley replied, "He just said, 'Don't report the gun stolen.' He
didn't say -- beg."


 At that point McKinley identified a statement he had given to
the police, and affirmed that he recalled reading it and signing
it. He also affirmed that the police read the statement to him and
he understood what they were reading. The statement, which was
later admitted into evidence, contained these declarations: "Derek
said don't report the gun stolen cause they used the gun in a
shooting. He was begging me not to report it."


 When the prosecutor next inquired whether he told the police
what happened, McKinley answered, "I told them what I said. I
don't know what they wrote down." Yet, he acknowledged that he
signed the paper.


 The prosecutor allowed McKinley to refresh his memory with the
written statement he provided the police. Then, when the
prosecutor asked McKinley if he recalled ever telling the police
anything about appellant begging him not to report it stolen, 
McKinley replied, "No. He didn't beg me. He just said, 'Don't
report it stolen.' You get on your knees begging. He wasn't doing
all that. He was standing on the side of me talking."


 Then, when an unrelated question was answered "No" by
McKinley, and the prosecutor requested him to refresh his memory,
the trial judge interrupted the proceedings, excused the jury and,
as pertinent to appellant's contention, said to McKinley, "I'm
going to give you an opportunity to read that statement that you
made, that you said you signed." Thereafter, the following
exchange between the court and McKinley was recorded:



 THE COURT: I wish for you to speak the truth and
only the truth of what you're saying. No more hemming
and hawing or fudging. Do you understand me?


 THE WITNESS: Yes, sir.


 THE COURT: Because you're going to have a problem
on your hands.


 THE WITNESS: They [the police] read [the statement]
to me, I signed. That's what I said. What more can I
say?


 THE COURT: That's the point that he was trying to
get you to understand. You read it. You didn't have any
complaint against it, and you signed it after hearing
that?


 THE WITNESS: Yeah. But he didn't beg me. That's
what I'm telling him. He came by. I told him that. But
I didn't' say he begged me. Begging is when you're on
your knees.


 THE COURT: That's neither here nor there for me. 
What I'm trying to tell you --


 THE WITNESS: I signed it. This is what I said.


 THE COURT: I'm not going to talk over you. All I
want you to recognize, there's something called perjury. 
It's a third degree felony, two to ten years in the
penitentiary and up to a $10,000.00 fine. As long as you
understand what's what.


 You're under oath. You do whatever you think is
best. But I just want you to understand that. The truth
is what we're going to have here today.


 Do you understand what I'm saying?


 THE WITNESS: (Witness nods.)


 THE COURT: I'm going to give you an opportunity to
read that statement in its entirety.


 THE WITNESS: This is what I said. I'm through with
it. This is what I said. I signed it. That's that. 


Appellant objected that "intimidation of the Court to this witness
amounts to an indirect comment on his credibility," prefacing his
objection with this comment: "Now, if there's inconsistency in the
document, it's up to the jury to decide." The court overruled the
objection, remarking that the witness "seems to be hemming and
hawing about statements that he says he made, that he didn't make."


 When the examination of McKinley about his statement continued
in the presence of the jury, the prosecutor asked, and McKinley
answered, as follows:


 Q. Is the truth everything in that statement (sic)?


 A. I signed it. If I had wrote it, maybe, I could
have said it's true. That's just my signature.


 Q. Is it true in the statement or not, yes or no?


 A. No. Some of it is, some of it ain't.


The question whether appellant "begged" McKinley not to report the
gun stolen was not asked in this examination. 


 On appeal, appellant asserts that the trial judge intimidated
the witness into changing his testimony in that before the judge's
remarks, the witness did not state he, appellant, was involved in
the shooting; but, after the remarks, the witness said he gave the
written statement and that it was true, and "thereby through the
language in the statement said Appellant told him he was involved
in the shooting." Without enlightenment by quoting the language in
the statement which qualifies as telling McKinley that appellant
was involved in the shooting, appellant concludes that he was
denied due process by the trial judge. 


 Preliminarily, it is observed that the variance from the
objection made at trial to the error contended for on appeal
probably has failed to preserved anything for our review. See
Rezac v. State, 782 S.W.2d 869, 870 (Tex.Cr.App. 1990). And it is
permissible for a trial judge to admonish a witness of the penalty
for perjury when the witness, as in this prosecution, has denied
the truthfulness of a prior statement. Webb v. State, 503 S.W.2d
799, 801 (Tex.Cr.App. 1974). 


 Secondarily, appellant misinterprets the wording of McKinley's
statement in expressing that "thereby through the language in the
statement said Appellant told him he was involved in the shooting." 
Other than the declaration that "[h]e was begging me not to report
it," there is nothing in McKinley's statement that is at variance
with his testimony, and particularly nothing in the statement 
logically leads to the conclusion that appellant told McKinley that
he was involved in the shooting. Thus, unlike the situation in
Davis, upon which appellant relies, McKinley did not change his
testimony as a result of the trial judge's admonition so as to
infringe appellant's due process rights. The second point of error
is overruled. 


 Appellant's third-point contention is that the trial court
improperly commented upon the testimony of Lannie Emanuel, the
ballistics expert who, having run tests on the cartridge casings
found in the Scott's alley as compared to casings known to be from
the M-12 purchased for appellant, opined the spent casing and the
live ammunition were consistent with the magazine on the M-12 and
"were produced on the same equipment or machine" as the ammunition
found in the clip of the M-12. More emphatically, he stated that
the casing found at the scene was fired from the M-12 "to the
exclusion of all other weapons."


 During his cross-examination on the subject by appellant's
counsel, the following is shown of record:



 Q. Now, one of your -- what you're supposed to do
with that weapon was to see whether it could have fired
the bullet or the cartridge that produced that casing?

 

 A. The cartridge case?


 Q. Yes.


 A. I never got the bullet as evidence.


 Q. Okay. The casing.


 A. The cartridge case, yes.


 Q. And you were also to determine --


The trial court interrupted with these remarks:



 Say, look, look. Now, this gentleman has testified
as to testing and results. Now, that speaks for itself
as to what he was intending to do. Do you have a
question that's pertinent and relevant to what you're
doing? It just seems like you're going over testimony
that we have gone over before, again.


After some discussion whether the questions had been asked and
answered, the court queried Emanuel whether he did "anything
different or anything else that you didn't testify to?" and 
Emanuel responded, "We haven't testified to the results of the
other weapon that was submitted. And there was a comparison
between cartridges from the magazine and -- that were submitted
later. . . ."


 Defense counsel requested, and was granted, permission to make
an objection outside the presence of the jury, and then, upon being
asked by the court whether he had any new questions, counsel
replied in the negative. After further redirect and recross-examination of the witness, the jury was excused and defense
counsel informed the court:


 My objection is this, Your Honor. I believe, your Honor
is indirectly coming into (sic) the weight of evidence in
this case. Specifically, you said that the results speak
for itself.


 Now, to me, that would suggest to the jury that this
is closed. I believe that that's very harmful. And
that's the basis of my objection.


The court overruled the objection, explaining that the "Court was
referring to you repeating questions, soliciting the same testimony
from this witness."


 Appellant argues that the judge's comments were improper
because they bore on the weight of the evidence, which is
prohibited by statute. See Tex. Code Crim. Proc. Ann. art. 38.05
(Vernon 1979). Prejudice resulted to him, appellant says, because
the judge's comments suggested to the jury that the critical issue--viz., whether he was present when the offense was committed and
shot the fatal bullet--was closed, since the witness Emanuel's
testimony that the cartridge case at the scene was fired from the
gun in his possession when he was arrested put him in possession of
the murder weapon, a circumstance bearing on his guilt. Moreover,
appellant suggests, the judge's comments must be viewed in light of
these statements by the judge to the jury panel: 


 Let me explain to you, so we'll understand each
other, where I'm coming from when I say this. I'm a
Republican. Conservative. I'm considered the hanging
judge in Dallas County. I'm considered the meanest
S.O.B. in the valley, folks. I give time like it's
lunch. I believe in strong law enforcement and the
police. . . .


These statements, appellant proposes, indicate the judge's
predisposition to expecting what the police and law enforcement in
general say as being fact, and were a strong and clear message to
the jury as to the believability and the credibility of law
enforcement officers and the police.


 Of course, it is well established that a trial judge should
studiously avoid making any remark calculated to convey to the jury
his opinion of the case of any fact issue raised by the evidence. 
McClory v. Sate, 510 S.W.2d 932, 934 (Tex.Cr.App. 1974). This
obtains because article 38.05, supra, is a clear mandate that trial
courts shall not comment upon the weight of the evidence or in any
way infer to the jury the court's opinion of any fact issues before
the jury for resolution. However, for such a violation to
constitute reversible error, the comment must be such that it is
reasonably calculated to benefit the State or prejudice the rights
of appellant. Howard v. State, 420 S.W.2d 706, 707 (Tex.Cr.App.
1967). 


 At the outset, we observe that the trial judge's quoted
statements to the jury panel occurred approximately one-fifth of
the way through his opening remarks covering 57 pages in the
statement of facts. Taken in context, the statements were a minute
part of the judge's opening ruminations on a variety of subjects,
including, but not limited to, courtesy and hospitality, bias and
prejudice, his childhood and some family history, the difficulties
and rewards of his judgeship, and the judicial system and the
responsibilities of citizens serving as jurors, as well as his
opinion of the mentality of state legislators. And contrary to
appellant's proposal that the judge's quoted comments were a strong
and clear message to the jury panel of his belief in the
believability and credibility of law enforcement officers and the
police and their testimony of facts, the judge later told the
panel:


 And, in the pool of humankind, let's face it, we've
got people who lie. We have judges who lie. Police
officers who lie. Priests and nuns who lie. And we can
all agree that presidents and presidential candidates,
they're going to lie.


 So the law says simply because you have a particular
job or a profession, you are not endowed with any great
truth-telling ability, and your credibility must be
judged by the same standard as everybody else.


Given the totality of the trial judge's unconventional address to
the jury panel, see, e.g., Texas Rules of Civil Procedure 226a;
Walker v. State, 440 S.W.2d 653, 658 (Tex.Cr.App. 1969), we have no
hesitancy in deeming it highly unlikely that jurors associated the
trial judge's remarks selected by appellant with his comments
regarding Emanuel's testimony. We, therefore, ignore the quoted
statements in resolving appellant's contention.


 On close inspection, it is apparent that the interruptive
comments by the trial judge did not convey to the jury an opinion
of the verity of Emanuel's testimony; instead, it is as apparent
that the judge was concerned with, and desired to avoid, time-consuming repetition of questions previously asked and answered. 
Indeed, the trial court invited defense counsel to ask pertinent
and relevant questions. When, as here, a trial judge, was
understandably concerned with the proper conduct of the trial and
cut off what the judge perceived to be a repetitive line of
questioning, there was no error in doing so. White v. State, 601
S.W.2d 364, 367 (Tex.Cr.App. 1980). Appellant's third point of
error is overruled.


 Appellant presents his fourth point to contend for an
abatement of this appeal to allow the trial court to enter findings
of fact and conclusions of law regarding the voluntariness of the
March 25 oral statement he purportedly made to officer Bobby
Hammer. The record reveals that mid-trial, the court held a
hearing in the absence of the jury on the admissibility of Hammer's
testimony of the statement for the purposes of rebutting
appellant's alibi defense and for impeachment. 


 Hammer testified that appellant was advised of his
constitutional rights, appeared to understand them, and was not
made any promises to make, or coerced into making, the oral
statement. Appellant cross-examined Hammer, but he did not testify
at the hearing. Appellant concedes that although his trial counsel
made objections to the admissibility of the statement, no issue was
raised as to the voluntariness of the statement. The trial court
ruled that the statement was admissible for purposes of impeachment
without making any findings of fact or conclusions of law. Nor,
appellant also concedes, was any objection made to the
voluntariness of the statement when Hammer testified to it on
rebuttal.


 Nevertheless, on appeal, appellant asserts in view of his
account that Hammer threatened him with the death penalty and
denied him the right to see his attorney, and that he was
handcuffed and made to lay face down on the floor, he does not know
whether the trial judge was conducting the sub rosa hearing on the
issue of voluntariness. Therefore, appellant submits, without
findings of fact and conclusions of law, he cannot be accorded his
right to a full and fair review of his conviction.

 

 Aside from the fact that appellant denied he made the
statement attributed to him by Hammer, he never raised the issue of
voluntariness until it was presented on appeal. If appellant
desired to contest the voluntariness of the statement, it was
incumbent upon him to object for that reason not later than when it
was used for impeachment. By waiting until the appeal, he waived
his right to a hearing on the voluntariness of the statement. Ross
v. State, 678 S.W.2d 491, 493 (Tex.Cr.App. 1984); Lindley v. State,
635 S.W.2d 541, 544-45 (Tex.Cr.App. 1982). Appellant's fourth
point of error is overruled. 


 Initially, appellant contends he was denied his right to
effective assistance of trial counsel, naming two specific
instances of omissions coupled with a general complaint that the
totality of his trial representation demonstrated improper
representation. Since all of the complaints are directed to trial
counsel's performance at the guilt-innocence phase of the trial,
the test by which appellant's contention is determined is whether
he showed that (1) counsel's representation fell below an objective
standard of reasonableness, and that (2) there is a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different. Hernandez v.
State, 726 S.W.2d 53, 55 (Tex.Cr.App. 1986) (following in full the
standards spelled out in Strickland v. Washington, 466 U.S. 668,
104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). 


 The determination of appellant's contention begins with the
presumption that trial counsel's conduct comported with reasonable,
professional assistance. Then, to sustain his challenge to
counsel's conduct, appellant must overcome the presumption that the
conduct might be considered sound trial strategy, Jackson v. State,
877 S.W.2d 768, 771 (Tex.Cr.App. 1994), by showing his allegations
of ineffective representation are firmly founded. Mercado v.
State, 615 S.W.2d 225, 228 (Tex.Cr.App. 1981). In this connection,
a cold trial record, recording the focus on the issues of guilt or
innocence and punishment and not on the conduct of trial counsel,
generally is deemed insufficient to gauge claims of ineffective
assistance of counsel in light of the strong presumption that
counsel's performance falls within the wide range of reasonable
professional assistance. Jackson v. State, 877 S.W.2d 768, 772
(Tex.Cr.App. 1994) (Baird, J., concurring). 


 Still, appellant attempts to show ineffective assistance of
trial counsel by first faulting him for failing, as previously
noted, to raise the issue of the voluntariness of his oral
confession to Detective Hammer, the statement Hammer said appellant
made on March 25. In doing so, appellant cites the record to show
his testimony "that prior to making the statement the Detective
threatened him with the death penalty, refused to let him talk with
his attorney, and handcuffed him and laid him on the floor face
down." Appellant misperceives the record. He did not preface his
testimony of the detective's action with "prior to making the
statement"; instead, he denied making the statement Hammer
attributed to him, and said that when Hammer tried to get him to
make a statement, "I just sat there." (10) 


 Confronted with appellant's denial of making the statement,
trial counsel may have deemed it incongruous trial strategy to
challenge the voluntariness of a statement his client denied
making. In any event, with nothing in the record to affirmatively
show why counsel did not raise the issue of voluntariness, the
presumption that counsel rendered reasonable professional
assistance in this instance is not overcome. Id. at 771; Delrio v.
State, 840 S.W.2d 443, 447 (Tex.Cr.App. 1992). 


 Second, appellant charges his trial counsel with failure to
object to the admission of McKinley's written statement and to
request a charge limiting the jury's consideration to the issue of
credibility. He asserts that albeit McKinley originally was
somewhat evasive about the contents of his statement, after the
hearing before the trial judge, he unequivocally admitted signing
the statement and making the statements therein. He relies on the
Texas Rules of Criminal Evidence 612(a) provision that where the
witness admits making a prior statement, "extrinsic evidence of
same shall not be admitted," and the holding in McGary v. State,
750 S.W.2d 782, 786 (Tex.Cr.App. 1988), that if the witness
unqualifiedly admits making the prior inconsistent statement, the
admission of the statement into evidence is precluded. And without
citation of supporting authority, he states his counsel should have
requested a limiting instruction once the statement was admitted.


 However, the previously recorded initial examination of
McKinley, the interjection of the trial judge's comments, and the
continued examination of McKinley during which he stated some part
of his prior written statement was true and some was not true,
clearly revealed that McKinley did not unqualifiedly admit making
the inconsistent written statement. Thus, his written statement
was properly introduced to impeach him. Id. at 786 n.3; Aranda v.
State, 736 S.W.2d 702, 708 (Tex.Cr.App. 1987), cert. denied, 487
U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988). Furthermore,
there being nothing in the record bearing on the reason why trial
counsel did not request a limiting instruction other than his in-
court statement that it was for the jury to decide whether there
was inconsistency in the document, it is not unreasonable to credit
the lack of a request for a limiting instruction to trial strategy
of avoiding the jury's focus on the statement. Garcia v. State,
887 S.W.2d 862, 881 (Tex.Cr.App. 1994), cert. denied, ___ U.S. ___,
115 S.Ct. 1368, 131 L.Ed.2d 223 (1995); Abbott v. State, 726 S.W.2d
644, 649 (Tex.App.--Amarillo 1987, pet'n ref'd). Consequently, on
this record, we cannot say that counsel's omissions rebutted the
presumption that he rendered reasonable professional assistance. 
Jackson v. State, 877 S.W.2d at 771.


 Finally, appellant contends that the totality of trial
counsel's representation was ineffective for three reasons. They
are that (1) he called two witnesses, James Dixon and Jack Parks,
and asked them no questions material to the trial; (2) he
continually had difficulty framing objections; and (3) the
relationship between the trial judge and counsel rendered the
representation ineffective. 


 Although counsel may not have asked Dixon or Parks material
questions, he attempted to elicit from Dixon, who was in jail with
appellant, what appellant had told him about his case, but that
line of inquiry was foreclosed by a successful objection. Absent
a showing that appellant would have benefitted from the witnesses'
testimony which counsel failed to adduce, the mere presentation of
the witnesses who produced no material testimony does not raise the
specter of ineffective assistance of counsel. See Holland v.
State, 761 S.W.2d 307, 319 (Tex.Cr.App. 1988), cert. denied, 489
U.S. 1091, 109 S.Ct. 1560, 103 L.Ed.2d 863 (1989). 


 With respect to appellant's claim that trial counsel
continually had difficulty framing objections, the record does
evince that the trial judge criticized counsel on occasion for the
wording of his objection. And on occasion the judge likewise
criticized the prosecutor for his wording of objections. A perusal
of the record does not indicate that the judge, albeit freely
expressing his disagreement with the wording of the objections,
showed antagonism or favoritism toward either to the detriment of
the interests each represented.


 On those occasions when the judge criticized appellant's trial
counsel for the wording of his objections, counsel rephrased his
objections and pursued them to either a favorable or adverse
ruling. Appellant's bare claim of his counsel's difficulty in
framing objections, without more, offers only mere speculation that
counsel was ineffective for that reason. Obviously, the record
lends no support for that holding. Jackson v. State, 877 S.W.2d at
771. 


 Appellant's claim that the relationship between the trial
judge and his trial counsel rendered counsel ineffective is
predicated upon the judge's initial remarks to the jury panel and
selected actions of counsel. Appellant points out that the judge
told the jury panel that defense counsel "happens to be a very
close personal friend of mine," but that "you-all will probably
think before the trial is over if things work like they normally
work, you'll think I hate [defense counsel] by the time we're done
because I'm on him." And that, "My attitude is, I treat everybody
in here the same. In fact, not only -- it's not an added advantage
becoming friends with me. It's probably a disadvantage because I'm
going to bend over backwards not to show you favoritism. [Defense
counsel] will know I'll do it to him." However, appellant neglects
to note that the judge also added, "It's the same way with [the
prosecutor]."


 Then, appellant selects instances in the proceedings when the
judge criticized counsel as being the "only one who seems
confused," for being unclear whether he was asking a new or follow-up question, for asking questions that were not pertinent or
relevant and repetitious, and for trying to solicit information
without giving the witness time to read the report in question,
together with refusing to allow counsel to make an objection. The
criticism, appellant asserts, resulted in counsel stating, "I'll do
whatever you want, Judge." 


 Appellant's assertion that the judge's criticism resulted in
counsel stating he would do whatever the judge wanted is an
unwarranted conclusion drawn from the premise of criticism. In
fact, counsel's statement followed the choice offered him by the
judge to present reports "now . . . [or] hold them over until
Monday," to a witness, who stated he could only answer counsel's
questions by replying, "I don't know," without benefit of the
reports. And, in context, counsel's statement was a mere offer to
proceed as the judge desired.


 Beyond that, the judge's criticism was but a fulfillment of
his prophecy to bend over backward not to show favoritism by being
"on" counsel, who, in the judge's words, "will know that I'll do it
to him." But, more importantly, appellant has not suggested how
the criticism, as well as the totality of counsel's representation,
evinced counsel's inability to properly represent him. The
adequacy of counsel's representation must be gauged by the totality
of the representation, Ex parte Perkins, 706 S.W.2d 320, 323
(Tex.Cr.App. 1986); and, in this regard, it does not escape notice
that counsel vigorously cross-examined the State's witnesses,
called witnesses of whom he asked pertinent, well articulated
questions, and elicited testimony casting doubt on Patsy's
identification of appellant as the man who robbed her and shot her
husband, and her identification of the truck she saw following
them. He also elicited testimony concerning appellant's alibi for
the time of the shooting and his good character and work ethic. 
And, he artfully directed appellant's testimony and offered
opportunities for rehabilitation on re-direct examinations.


 Taking into account that appellant's constitutional right to
counsel does not mean errorless counsel where adequacy of
representation is argued or judged purely by hindsight, Holland v.
State, 761 S.W.2d at 320, appellant has failed to show that his
trial counsel's overall performance was deficient and that, but for
such deficiencies, there exists a reasonable probability the result
of the proceeding would have been different. Appellant's failure
dictates that his first point of error must be overruled, id., and
it is overruled. 


 Accordingly, the judgment is affirmed.




 Charles L. Reynolds

 Senior Justice


Do not publish. Tex. R. App. P. 90(c).
1. Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of
Appeals, sitting by assignment. Tex. Gov't Code Ann. §
75.002(a)(1) (Vernon Supp. 1996).
2. Imposition of a life sentence for a capital offense where the
death penalty is not sought is provided for in section 12.31 of the
Texas Penal Code Annotated (Vernon 1994).
3. Bruce Adams, crime scene officer for the City of Dallas,
defined "casings" for the jury as "the brass part of a bullet. In
a semi-automatic weapon or automatic weapon, the brass -- the
bullet goes through the barrel and then it ejects the brass end out
of the gun." He testified that only one casing and several rounds
of live ammunition, but no bullets, were recovered at the scene.
4. References to Beasley are to Ricky Beasly, Ricky Beasley and
Rickie Beasley, as he is variously referred to in the record.
5. Detective King also testified that an attempted escape charge
was pending against appellant for his conduct.
6. Although appellant was unsure of Vanessa's last name, she was
the Vanessa Lavon Littleton who testified on appellant's behalf.
7. Prior to Conn's and Hart's testimony before the jury, the
court conducted a hearing outside their presence to determine the
relevance of the evidence, and no complaint is made against the
admission of this evidence. See Tex. R. Crim. Evid. 404.
8. The jury was charged on the law of parties and on conspiracy
to commit a felony. 
9. Appellant has not challenged the factual sufficiency of the
evidence to support his conviction.
10. Perhaps appellant's present claim of making an "oral
confession" arises from the fact that during his testimony, he
identified a written statement he gave on March 21, which both he
and the State introduced into evidence.